760 F.2d 1520
 T.D.S. INCORPORATED, d/b/a Lord & Lady Restaurant, Thomas
Starr, and Dorothy Starr, Plaintiffs-Appellees,
v.
SHELBY MUTUAL INSURANCE COMPANY, a foreign corporation
authorized to do business in the State of Florida,
Defendant-Appellant.
 No. 83-3622.
 United States Court of Appeals,
Eleventh Circuit.
 May 24, 1985.
 
 W. Donald Cox, Chris Altenbernd, William A. Gillen, Tampa, Fla., for defendant-appellant.
 John W. Berry, St. Petersburg, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT and FAY, Circuit Judges, and ALLGOOD*, District Judge.
 FAY, Circuit Judge:
 
 
 1
 Defendant Shelby Mutual Insurance Company (Shelby) appeals from a judgment awarding its insured, T.D.S. Incorporated d/b/a Lord & Lady Restaurant (TDS), $2,620,000.00 in damages. TDS claimed that Shelby breached an insurance contract by refusing to pay on a fire loss claim submitted by the corporation. TDS also sought punitive damages based on the tortious conduct of Shelby and its agents. Shelby, on the other hand, asserted the defenses of arson and material misrepresentation, and also counterclaimed for the amount it paid to another insured, Eugene Cohenour. The jury found in favor of plaintiff on all claims, and returned a verdict for $100,000.00, an amount equal to the insurance policy limit, plus special compensatory damages of $420,000.00, and $2,100,000.00 in punitive damages.
 
 
 2
 On appeal, Shelby essentially argues that (1) the district court should have directed verdicts against TDS on the punitive and special compensatory damages claims; (2) the awards on these claims are excessive; and (3) the district court committed reversible error by not ordering separate trials on plaintiff's contract and tort claims. We agree with Shelby that the award for special compensatory damages is excessive and therefore should be reduced. Our review of the record, however, convinces us that in all other respects the judgment appealed from should be affirmed.I. FACTUAL BACKGROUND
 
 
 3
 In 1979, Thomas and Dorothy Starr formed TDS, a closely held corporation incorporated under Florida law, in order to open a restaurant in Bradenton, Florida. TDS purchased the business assets of the Lord & Lady Restaurant for $150,000.00 in July of that year. To finance the deal, TDS made a $40,000.00 cash down payment, assumed a promissory note owing to a local bank, and gave Belfrap, Inc., the seller of the business, a $55,000.00 promissory note. The accrual of interest and payments on this note were deferred for five years.
 
 
 4
 Contemporaneous with the purchase of the restaurant's personal property, the restaurant's lease was assigned to the Starrs individually. The lease contained an option to purchase the building in which the restaurant was located. To preserve the option, the Starrs, as lessees, were required to make an annual payment of $2,000.00 to Eugene Cohenour, the owner of the building.
 
 
 5
 TDS engaged the services of an independent insurance agent, and through him purchased from Shelby a multi-peril insurance policy. Shelby agreed in that policy to provide TDS with $100,000.00 in fire coverage for personal property including leasehold improvements.
 
 
 6
 The building which housed the restaurant also contained a warehouse, used for storage by the building's owner, and a beauty salon. On January 13, 1980, at approximately 1:30 a.m., a fire began in the building. Although the restaurant had already closed for the day, customers and several TDS employees still occupied the lounge, as did the Royal Shaft, a band engaged by TDS to provide musical entertainment. Both Mr. & Mrs. Starr were also in the building at this time. After the fire was discovered, the fire department was summoned and everyone safely evacuated the building.
 
 
 7
 Shortly thereafter, the Westside Fire Department arrived and, with the help of two other volunteer fire departments, extinguished the blaze. The building and its contents sustained extensive damage.[1]
 
 
 8
 Because the fire was of suspicious origin, the Westside Fire Department requested the assistance of the State Fire Marshall. Deputy State Fire Marshall Joseph Ladika arrived at the scene soon after the fire had been extinguished. After conducting a fire and site investigation, he concluded that the fire had only one point of origin--the locked office of the Lord & Lady Restaurant, to which only the Starrs had the keys. He also believed that the fire was of incendiary origin, fueled by some type of accellerant. In the early part of February, Mr. Ladika prepared an official State Fire Investigation Report outlining his findings.
 
 
 9
 Gene Spencer, claims manager for Shelby's local office, visited the fire site on January 14, 1980. He examined the building and took some photographs.[2] Mr. Spencer concluded that two fires had been intentionally set in the building; one in the office of the restaurant, and one in the warehouse. He also suspected Mr. Starr as the arsonist. Mr. Spencer submitted a memorandum containing his conclusions to Shelby's claims supervisor, William Brennan, on January 17.
 
 
 10
 A day or two after the fire, Mr. Spencer retained Equifax, Inc., to investigate the cause and origin of the fire. Equifax sent Gary Haun to conduct a site investigation on January 15, 1980. Contrary to Deputy State Fire Marshall Ladika and Mr. Spencer, Mr. Haun concluded that three separate fires had been intentionally set--one in the restaurant's office, one in the warehouse, and one in the area above the restaurant's kitchen. Mr. Haun also concluded that the Starrs had set the fire. Mr. Cohenour had immediately been dismissed as a serious suspect. Based in part on the erroneous assumption that TDS stood to collect $150,000.00 from Shelby, Mr. Haun projected a clear motive for the Starrs to commit arson. He sent a report reflecting his views to Shelby on January 29, 1980.
 
 
 11
 On January 14th or 15th, Gene Spencer retained Richard Wilson, an experienced arson attorney. Mr. Spencer felt this was necessary because of his inexperience in adjusting arson claims of such complexity. Mr. Wilson, under Mr. Spencer's direct and close supervision, coordinated Shelby's fire investigation and was privy to all information given to Shelby by the fire investigators. By letter dated March 5, 1980, Mr. Wilson advised the Starrs that he was representing Shelby and was assisting in the investigation of TDS's fire loss claim. The letter noted that Shelby had reason to believe that the fire was the product of arson, and requested, pursuant to a clause in the insurance policy, an examination of the Starrs under oath. The letter also asked the Starrs to bring with them to the examination numerous financial documents.
 
 
 12
 Two days after the Starrs received the letter, Arthur Vandroff, the Starrs' business attorney, telephoned Mr. Wilson. Mr. Vandroff informed Mr. Wilson that he was not qualified to represent anyone in a case involving arson, and that he wished only to assist TDS in preparing its proof of loss. Mr. Vandroff also told Mr. Wilson that if Shelby had any information implicating his clients in arson, he wanted to know up front so he could refer the case to a qualified arson attorney. Mr. Wilson mollified Mr. Vandroff with the assurance that Shelby had no such information, and by stating that the examination under oath would involve only the proof of loss and some general questions concerning the Starrs. Mr. Vandroff was not informed at that time that Shelby had information suggesting that a fire had been set in the restaurant's locked office.
 
 
 13
 Mr. Starr's examination under oath was conducted by Mr. Wilson on March 26, 1980. Also present were Gene Spencer and Arthur Vandroff. Before the examination began, Mr. Wilson informed Mr. Vandroff that Shelby had reason to believe that four separate fires had been set--one in the office, and three in Eugene Cohenour's warehouse. Mr. Wilson then asked Mr. Vandroff to inform the Starrs that this information concerning the fire's points of origin was to be kept in the strictest confidence. Mr. Vandroff was not told, however, that Shelby had already paid Mr. Cohenour $125,000.00, his policy limits. Mr. Vandroff spoke with the Starrs, who indicated they were willing to proceed with the examination. He advised Mr. Wilson that because he was not an arson attorney, he would not allow Mr. Starr to testify if Shelby had any information or reports indicating that the Starrs had set the fires. Mr. Vandroff again was assured that Shelby had no such knowledge. The examination which followed lasted a full day. A few days later, Mr. Wilson sent Mr. Vandroff a letter thanking him and the Starrs for their cooperation.
 
 
 14
 Mrs. Starr's examination under oath was scheduled for April 10, 1980. Prior to that time, however, Mr. Starr received a letter from ASIC, the insurer which paid for the fire damage to the beauty salon. See infra note 1. The letter stated that ASIC was subrogated to the rights of its insured, and that an investigation indicated that Mr. Starr was legally liable for the fire loss. Mrs. Starr gave the letter to Mr. Vandroff the same day she was to be examined by Mr. Wilson.
 
 
 15
 Mr. Vandroff confronted Messrs. Wilson and Spencer with the letter and their prior assurances that Shelby had no information or reports implicating the Starrs in arson. Mr. Spencer stood by their earlier representations, and asked to use a phone in Mr. Vandroff's office. After making a telephone call, Mr. Spencer told Mr. Vandroff that the letter should not have been sent. Mr. Spencer then reiterated his assurances concerning the Starrs and arson. The examination of Mrs. Starr proceeded as scheduled.
 
 
 16
 Mr. Starr later received a letter from ASIC informing him that the prior letter had been sent in error. Mr. Vandroff was now satisfied that Mr. Spencer had been telling him the truth.
 
 
 17
 After the April 10 examination, Mr. Wilson told Mr. Vandroff that Shelby was still investigating the cause and origin of the fire. Later, in response to a letter sent by Mr. Vandroff in late May, 1980, inquiring as to status of TDS's claim, Mr. Wilson, also by letter, finally informed Mr. Vandroff that Shelby was denying TDS's claim. The stated reasons for denial were willful and intentional misrepresentation and concealment of material facts regarding the cause of the fire and the nature and extent of TDS's loss. Mr. Vandroff received the denial letter on April 23, 1980. Baffled by the denial, he immediately telephoned Mr. Wilson who stated that Shelby believed the Starrs committed the arson. Mr. Vandroff was livid considering the repeated assurances he had been given concerning Shelby's lack of information tending to inculpate the Starrs in arson.
 
 
 18
 TDS brought suit against Shelby in state court in October, 1980. The law firm of Richard H. Wilson, Esquire, appeared on behalf of Shelby and removed the case to federal district court.
 
 
 19
 In Count I of its third amended complaint, TDS sought payment under the personal property fire insurance policy issued by Shelby and special damages. Count II of that complaint sought punitive damages for the tortious conduct of Shelby. In general terms, that count alleged fraud, tortious interference with property rights, and defamation. Shelby answered and asserted the defenses of arson and misrepresentation. Shelby also counterclaimed against TDS for $125,000.00, the amount it paid Eugene Cohenour for the fire damage to his building.
 
 
 20
 Because the trial court would not grant separate trials on the two counts, Richard Wilson moved the court to allow him to withdraw as Shelby's counsel; it became clear that he might be called as a witness during the trial of the punitive damages count. The district court granted the motion, and substitute counsel tried the case in the district court, and represents Shelby on appeal.
 
 
 21
 A jury trial lasted nearly two and one-half weeks. TDS presented a considerable amount of evidence concerning the following: (1) the adequacy of the various cause and origin investigations; (2) Shelby's single-minded pursuit of only that evidence reinforcing its conclusion that the Starrs were guilty of arson; (3) the financial solvency of the Starrs; (4) the fact that Lord & Lady Restaurant was approaching profitability; (5) the allegedly fraudulent conduct of Shelby, particularly the actions of Richard Wilson and Gene Spencer in dealing with Arthur Vandroff; and (6) the litigation conduct of Shelby. Shelby, on the other hand, focused at trial on its contention that only the Starrs had access to all of the areas found by its experts to be points of origin of the fire, the fact that the business had been consistently losing money, and the reasonableness of denying TDS's claim in light of the reports submitted to it. The jury returned a verdict in favor of TDS on all claims. Shelby's post-trial motions for relief were denied, and this appeal followed.
 
 II. PUNITIVE DAMAGES
 
 22
 Shelby advances several theories in support of its argument that the district court should have directed a verdict in its favor on the plaintiff's claim for punitive damages: (1) the plaintiff was allowed to introduce prejudicial evidence relevant only to a "bad faith refusal to pay" claim, a claim not recognized in Florida for first party[3] insurance claims; (2) the submission of the defense of arson to the jury precluded the jury's consideration of the punitive damages claim; and (3) there was no evidence that an independent tort caused Shelby to deny TDS's claim. We address these arguments seriatim.
 
 
 23
 A. Florida Law and "Bad Faith Refusal to Pay"
 
 
 24
 Florida law is clear "that a suit for punitive damages will not lie against an insurance company for bad faith in failing to pay a first party claim." Smith v. Standard Guaranty Insurance Co., 435 So.2d 848, 849 (Fla.Dist.Ct.App.), petition for review denied, 441 So.2d 633 (Fla.1983); see Kent Insurance Co. v. Hassan, M.D., 447 So.2d 323 (Fla.Dist.Ct.App.1984). This view is premised in part on the notion that in a first party claim situation, the insurer "and its insured occupy the status of debtor and creditor." Smith, 435 So.2d at 849 (citing Baxter v. Royal Indemnity Co., 285 So.2d 652 (Fla.Dist.Ct.App.1973), cert. discharged, 317 So.2d 725 (Fla.1975)). To recover punitive damages, the plaintiff must show more than generalized "bad faith;" the plaintiff must show that the conduct of the insurer rose to the level of "deliberate, overt and dishonest dealings," Smith, 435 So.2d at 849, constituting an independent tort. See Kent Insurance Co., 447 So.2d at 324; Industrial Fire & Casualty Co. v. Romer, 432 So.2d 66 (Fla.Dist.Ct.App.), petition for review denied, 441 So.2d 633 (Fla.1983). Neither Shelby nor TDS dispute the applicable Florida law or the district court's charge to the jury on this issue.[4] Shelby, however, does argue that the trial court erroneously allowed TDS to try a "bad faith" claim, to Shelby's prejudice. We disagree.
 
 
 25
 The gist of Shelby's complaint is that TDS was allowed, over objection, to attack the accuracy and adequacy of the fire investigation which Shelby asserted resulted in the denial of TDS's claim. According to Shelby, the assessment of punitive damages was based not on any evidence of an independent tort, but rather on Shelby's decision to raise an arson defense. From this reasoning, it follows that evidence of Shelby's litigation conduct and the evidence concerning the adequacy of the basis upon which Shelby denied the claim was irrelevant to the independent tort claim. The straw man erected by Shelby, however, is easily dismantled.
 
 
 26
 Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. True, the allegedly objectionable evidence is relevant to a claim not countenanced by the Florida courts; it does not ineluctibly follow, however, that this evidence also is irrelevant to claims which are properly entertained. Certainly the litigation conduct of Shelby was relevant to the claim that Shelby or those acting on its behalf dealt dishonestly with TDS. Although this conduct occurred after the denial of TDS's claim, it did corroborate TDS's contention that Shelby deliberately deceived it while Shelby was investigating the fire. Additionally, much of the evidence concerning the recklessness of the investigation and the poor quality of the investigative reports Shelby stated it relied upon to deny TDS's claim is relevant to the issue of whether in fact the fire was the result of arson and, if so, the identity of the arsonist. Surely these are matters of consequence in an insurance suit where arson is raised as a defense.
 
 B. Shelby's Prima Facie Arson Defense
 
 27
 Shelby next asserts that the district court's refusal to strike Shelby's defense of arson at the conclusion of the evidence in defense precluded submission of the punitive damages claim to the jury.[5] In support of this position, Shelby refers us to cases from jurisdictions, which, unlike Florida, do sanction first party "bad faith refusal to pay" claims. Shelby's reliance on these cases, however, is misplaced.
 
 
 28
 This court, in Winningham v. Centennial Insurance Co., 708 F.2d 658, 659 (11th Cir.1983), a diversity case in which Georgia law provided the rule of decision, concluded that an insurance company is not liable for punitive damages for refusing to pay on a claim by its insured when the insurer has a reasonable basis for litigating, rather than paying, the claim. Similarly, in Dempsey v. Auto Owners Insurance Co., 717 F.2d 556 (11th Cir.1983), we had occasion to apply Alabama "bad faith refusal to pay" law in a first party claim situation. We noted that in Alabama, an insurer may subject itself to punitive damages when it has no legal or factual defense to a claim, yet nonetheless refuses to pay it. Id. at 561. Put another way, "[w]hen a [first party] claim is 'fairly debatable,' the insurer is entitled to debate it whether it concerns a matter of fact or law." Id. at 560. More recently, the Alabama Supreme Court held in a first party claim case that when a jury question is presented on the insurance contract claim, the jury is precluded from also considering the tort claim of "bad faith refusal to pay." National Security Fire & Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984). Shelby argues that the policy behind these decisions compels a similar conclusion here. Shelby again, however, skews the distinction between a true "bad faith refusal to pay" claim and the one actually tried and submitted to the jury in the district court.
 
 
 29
 We need only compare the elements of a first party refusal to pay claim and its Florida cousin to realize that, although superficially similar, these theories of recovery are materially different. The Alabama Supreme Court defined the tort of "bad faith refusal to pay" a first party insurance claim as follows:
 
 
 30
 [A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."
 
 
 31
 Id. at 944 (quoting Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 7 (Ala.1981)) (emphasis deleted). That court fleshed out the contours of the fledgling tort in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982), where it stated that a plaintiff in a "bad faith refusal to pay" case has the burden of proving:
 
 
 32
 (a) an insurance contract between the parties and a breach thereof by the defendant;
 
 
 33
 (b) an intentional refusal to pay the insured's claim;
 
 
 34
 (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
 
 
 35
 (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
 
 
 36
 (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
 
 
 37
 Id. at 183 (quoted in Vintson, 454 So.2d at 944).
 
 
 38
 From these authorities, it is clear that an essential element of a first party bad faith claim is the indisputable nature of the claim denied by the insurer. If a fact question exists concerning an insurer's defense, i.e., the plaintiff is not entitled to a directed verdict on the contract claim, the plaintiff, by definition, has failed to carry the initial burden of proof. By contrast, Florida law, the law applied by the district court, requires a plaintiff to establish that the insurer engaged in dishonest conduct constituting a tort separate and distinct from the insurance contract sued upon. For example, in this case, evidence was presented and the jury was instructed on the independent tort of fraud. The presence of a fact question on the defense of arson does not negative TDS's claim that Shelby engaged in deliberate, overt, and dishonest dealings. The bad faith refusal to pay cases simply are not controlling in the facts before us.
 
 C. Punitive Damages and Fraud
 
 39
 To comply with Florida's independent tort requirement, the district court provided the jury with standard fraud instructions. Specifically, the court instructed the jury on four allegedly fraudulent statements which supposedly occurred between the day of the fire and the day TDS's claim was denied.[6] Shelby argues that since there is no evidence that these statements resulted in denial of the claim, the district court erred in even submitting the punitive damage claim to the jury. We disagree.
 
 
 40
 Contrary to Shelby's suggestion, TDS has never argued that these statements caused the denial of the claim submitted by the plaintiff. TDS instead maintained throughout these proceedings that Shelby's tortious conduct, inter alia, (1) impaired TDS's ability to timely prove that its agents did not set the fire; (2) exposed TDS to unnecessary collateral lawsuits; (3) impaired TDS's ability to discover who set the fire so as to recover from that person its uninsured loss; and (4) made it impossible to reestablish the restaurant business. Shelby has not directed our attention to, nor have we found, any Florida case holding that, to be actionable, the independent tort sued upon must have caused the breach of the insurance contract or the actual denial of a first party claim. We accordingly discern no sound reason for disturbing the district court's decision to submit the punitive damage claim to the jury.
 
 
 41
 We conclude, therefore, that (1) plaintiff was not erroneously allowed to try a "bad faith refusal to pay" claim, in contravention of Florida law; (2) the fact that a jury question existed on the arson defense did not preclude submission of the punitive damages claim to the jury; and (3) the absence of evidence that the fraudulent statements caused the denial of TDS's claim does not counsel holding that the punitive damage claim should not have been submitted to the jury. Viewing all the evidence, along with all logical inferences flowing from the evidence, in the light most favorable to TDS, we hold that there was sufficient conflict in substantial evidence to warrant submission of the punitive damage claim to the jury. See Neff v. Kehoe, 708 F.2d 639, 641-42 (11th Cir.1983). After carefully reviewing the record, we also hold that reasonable jurors could have concluded that Shelby engaged in deliberate, overt and dishonest dealings with TDS. See infra pp. 1530 - 1531. The assessment of punitive damages was justified.
 
 D. The Amount of Punitive Damages
 
 42
 Shelby next argues that the district court erred in denying its post-judgment motions for remittitur, or, in the alternative, for a new trial. We disagree, finding that the district court acted well within its discretion in leaving intact the $2,100,000.00 punitive damage award.[7]
 
 
 43
 The Florida courts are chary of disturbing punitive damages verdicts returned by juries.[8] The Florida Supreme Court stated the law as follows:
 
 
 44
 Although the verdict may be for considerably more or less than in the judgment of the court it ought to have been, still the court should decline to interfere, unless the amount is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake. In order to shock the sense of justice of the judicial mind the verdict must be so excessive or so inadequate so as at least to imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like.
 
 
 45
 Lassitter v. International Union of Operating Engineers, 349 So.2d 622, 627 (Fla.1976) (citation omitted). To determine whether a punitive damage award is excessive, the court may consider the relationship between the amount awarded and (1) the degree of misconduct involved, as well as (2) the defendant's ability to pay the judgment. Arab Termite and Pest Control, Inc. v. Jenkins, 409 So.2d 1039, 1042-43 (Fla.1982); see Louisville and Nashville Railroad v. Hickman, 445 So.2d 1023 (Fla.Dist.Ct.App.1983), petition for review dismissed, 447 So.2d 887 (Fla.1984). More specifically, a court may:
 
 
 46
 order a new trial or remittitur when the manifest weight of the evidence shows that the amount of punitive damages assessed is out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct.... [T]his finding must be affirmatively supported by the record or the judge must find that the jury was influenced by matters outside the record.
 
 
 47
 Arab Termite, 409 So.2d at 1042. Additionally, a punitive damage award may be deemed excessive if it not only "smarts," but also is out of all proportion to the defendant's financial position. Hickman, 445 So.2d at 1028; see also Arab Termite, 409 So.2d at 1043 ("Punitive damages should be painful enough to provide some retribution and deterrence, but should not be allowed to destroy the defendant.").
 
 
 48
 With these principles in mind, we conclude that the district court properly denied Shelby's motions for post-trial relief. As we have seen, Florida law allows recovery of punitive damages in a first party refusal to pay case when the plaintiff demonstrates that the insurer engaged in "deliberate, overt and dishonest dealings." Smith, 435 So.2d at 849. In this case, the jury so found[9] and the district judge who presided over the lengthy and bitterly fought trial refused to disturb their considered judgment. Moreover, the plaintiff introduced considerable evidence showing that Shelby, from as soon as a day after the fire, had decided not to pay TDS's claim, regardless of any evidence tending to exonerate TDS from the charge of arson. The record also reflects that Richard Wilson and Gene Spencer deliberately deceived TDS throughout the period that Shelby had been solidifying an arson defense, to TDS's detriment. Post-denial conduct of Shelby corroborated TDS's essential contention that what it purchased from Shelby was not insurance against various hazards but rather years of contentious, costly litigation fueled initially by fraud. In these circumstances, we cannot hold that the manifest weight of the evidence shows that the $2,100,000.00 punitive damage award is out of all proportion to the deliberate, overt and dishonest dealings which reasonable jurors could have found. Similarly, the record indicates that the award will not inflict undue financial hardship on Shelby. Indeed, Shelby has never argued that the amount awarded is disproportionate to its ability to pay.[10] We therefore conclude that the award does not exceed " 'the maximum limit of a reasonable range within which the jury may properly operate.' " Warren v. Ford Motor Credit Co., 693 F.2d 1373, 1380 (11th Cir.1982) (quoting Keyes v. Lauga, 635 F.2d 330, 336 (5th Cir.1981) ); accord, Lassitter, 349 So.2d at 627. That part of the judgment awarding TDS $2,100,000.00 in punitive damages is accordingly affirmed.
 
 III. SPECIAL COMPENSATORY DAMAGES
 
 49
 In addition to punitive damages, the jury also returned a verdict of $88,000.00 for damaged business personal property, $12,000.00 for damages to leasehold improvements, and $420,000.00 in special compensatory damages. Shelby contests on appeal only the special damage award, contending that the district court erred in not directing a verdict in Shelby's favor on TDS's claim to these damages. In the alternative, Shelby argues that the special damage award is excessive. After reviewing the record, we conclude that the district court did not err in submitting the claim of special damages to the jury; the award, however, is excessive and will be reduced to comport with the evidence adduced at trial.
 
 
 50
 The district court instructed the jury that TDS could be awarded special damages for (1) loss of a valuable business opportunity, or (2) loss of a business or credit reputation, due to Shelby's failure to pay amounts due under the insurance policy. T. 13:323. The jury was further instructed that an award could be returned for these special elements of damages if TDS had shown that "special circumstances" allowing for these damages had been in the contemplation of the parties at the time the insurance policy was entered into. Id. at 13:319. The district court's charge also stated that special damages could be awarded if Shelby had committed fraud upon TDS. Id. at 13:320. Neither party objects to the content of these instructions.[11] Shelby, however, argues that the district court should never have given these instructions because the evidence could not support an award of special damages, under either a contract or tort theory.
 
 
 51
 TDS presented a considerable amount of evidence on the issue of special damages.[12] For example, Mr. Alario and Mrs. Starr gave their opinion on the value of the restaurant and lounge. Mrs. Starr and Attorney Vandroff also testified that several collateral lawsuits were filed against either TDS or the Starrs as a result of Shelby's failure to pay on the fire claim. Additionally, TDS contended throughout the trial that Shelby's misrepresentations concerning the arson investigation and the part TDS played in it deprived it of the ability to conduct its own timely investigation of the fire so as to prove its innocence and insist on payment from Shelby. In this regard, TDS maintained that Shelby's fraudulent statements hampered efforts to discover the identity of a blonde boy seen in the warehouse shortly before the fire occurred, as well as the whereabouts of a waitress the Starrs had fired an hour before the fire began. Id. at 9:322. TDS also presented evidence that, absent Shelby's fraud, TDS would have secured the debris which had been removed from the office and later discarded. Arthur Vandroff, TDS's business attorney, testified that he advised the Starrs that once a settlement was reached with Shelby concerning the fire loss, they should, pursuant to the lease, instruct Eugene Cohenour to rebuild[13] the building so that the restaurant and lounge could be reopened. Id. at 9:90. The Starrs indicated that they were anxious to follow this advice. Id. Attorney Vandroff further testified that had he known during the period he was dealing with Mr. Wilson of the one-dimensional approach of Shelby's investigation, its singular focus on TDS and its agents as suspects, its decision early on that TDS was responsible for the fire, and the information which implicated his client in arson, he would have promptly called in an arson expert to investigate the cause of the fire. Id. at 9:95-96. He also testified that had he realized the true nature of Shelby's investigation, he would have referred his client to an attorney experienced in handling a case involving an arson defense. Id. at 8:321.
 
 
 52
 We are unable to hold that these facts and the logical inferences to be drawn from them "point so strongly and overwhelmingly in favor of" Shelby that we believe "that reasonable men could not arrive at a contrary verdict." Neff v. Kehoe, 708 F.2d 639, 641 (11th Cir.1983). Reasonable and fair-minded jurors certainly could have concluded that but for Shelby's deception, TDS would more likely than not have been able to reestablish the valuable restaurant and lounge business. The district court therefore properly denied Shelby's motion for a directed verdict on TDS's claim to special damages.
 
 A. The Amount of Special Damages
 
 53
 Shelby argues that even if the special damage claim was properly submitted to the jury, the amount awarded, $420,000.00, is clearly excessive. We agree.
 
 
 54
 As we have seen, the jury was instructed that special damages, under either a tort or contract theory, could be awarded only if TDS demonstrated a loss of a valuable business opportunity or a loss of a business or credit reputation. Shelby correctly notes that TDS did not show any entitlement to lost profits; indeed, the district court refused to give the jury an instruction on lost profits.[14] We also agree with Shelby that the special damage award could not properly be predicated on the option to purchase the Cohenour building, even though there was much testimony concerning the value of the option itself as well as the value of the real estate which it secured. The option was owned by the Starrs individually, not by TDS, the only party-plaintiff in this action.[15] We thus cannot hold that the Starrs' loss of the ability to exercise the option is equivalent to TDS's loss of a valuable business opportunity. Additionally, though sufficient evidence concerning damage to TDS's credit reputation may have been presented to avoid a directed verdict, TDS does not suggest on appeal that these injuries approach the amount awarded by the jury. TDS does not even offer a figure for these damages, and we accordingly can only conclude that they do not support a $420,000.00 award.
 
 
 55
 After carefully reviewing the record before us, the only lost business opportunity shown by TDS with the requisite degree of certainty is the value of the restaurant and lounge.[16] Charles Alario, the real estate broker who handled the sale of the Lord & Lady Restaurant from Belfrap, Inc. to TDS, valued the business in the spring of 1978 to be $240,000.00. T.1:115. Mrs. Starr, an experienced businessperson, valued the business in January, 1980, without consideration of the value of the option to purchase the building and the land, at $225,000.00. Id. at 9:279-80. Shelby presented no evidence to the contrary. We therefore perceive no sound reason not to accept her estimate of the business' value as the proper measure of damages for TDS's loss of a valuable business opportunity. Cf. Neff, 708 F.2d at 644 (though self-serving and uncorroborated, owner's testimony concerning value of property is admissible; proper manner in which to refute owner's valuation is by cross-examination or independent evidence). For this reason, we conditionally remit the special compensatory damages award to $225,000.00. If plaintiff refuses the remittitur, the district court shall grant a new trial solely on the issue of special compensatory damages. See Warren, 693 F.2d at 1380; see also Stewart & Stevenson Services v. Pickard, 749 F.2d 635, 650 n. 18 (11th Cir.1984) (ordinary practice is to direct district court on remand to order remittitur, or to grant new trial on damages issue at option of plaintiff); Quality Foods, Inc. v. U.S. Fire Insurance Co., 715 F.2d 539, 543 n. 3 (11th Cir.1983) (court of appeals has authority to reduce a judgment).
 
 IV. RULE 42
 
 56
 Shelby's final argument on appeal is that the district court erred in not ordering separate trials on Shelby's defense of arson and TDS's claim for punitive damages. Shelby maintains that it was unfairly prejudiced since the jury simultaneously heard evidence of Shelby's arson defense and TDS's "bad faith" punitive damages claim, a claim which Shelby regards as based solely on its decision to raise an arson defense. In support of this position, Shelby likens TDS's punitive damages claim to one for malicious prosecution.
 
 
 57
 We acknowledge that an essential element of a malicious prosecution action is the bona fide termination of the prosecution in the plaintiff's favor. See, e.g., DeMarie v. Jefferson Stores, Inc., 442 So.2d 1014, 1016 n. 1 (Fla.Dist.Ct.App.1983); Waite v. Ward, 413 So.2d 830 (Fla.Dist.Ct.App.1982). We thus concede that if in fact TDS's claim for punitive damages was predicated on Shelby's arson defense, the malicious prosecution analogy might be persuasive and militate against allowing both to be tried in the same action.[17] Shelby, however, again confuses a first party bad faith claim with the one involved in this case. TDS presented evidence of an independent tort involving deliberate, overt and dishonest dealings, i.e., fraud. TDS did not allege, nor was the jury instructed, that a finding of dishonest dealings could be premised on Shelby's decision to raise an arson defense; rather, the gravamen of TDS's quarrel with Shelby stems from the latter's deception and concealment concerning the arson investigation and the facts derived from it. It is clear, therefore, that the punitive damages claim does not rise or fall with the decision to raise the arson defense, or, for that matter, the legal sufficiency of that defense. See infra Part II. B. Shelby's reliance on malicious prosecution cases is accordingly misplaced.[18]
 
 
 58
 Rule 42 provides that the district court may order separate trials of any claims or issues "in furtherance of convenience or to avoid prejudice, or when separate trial will be conducive to expedition and economy." Fed.R.Civ.P. 42(b). We will not disturb a district court's decision not to order separate trials absent an abuse of discretion. See Itel Corp. v. Cups Coal Co., 707 F.2d 1253, 1260 (11th Cir.1983). We have reviewed the record, and discern no such abuse.
 
 
 59
 In summary, we affirm the judgment appealed from in all respects except the award of special damages. We find $225,000.00 to be the maximum possible recovery for these damages and order a conditional remittitur to that amount. If TDS refuses the remittitur, the district court shall grant a new trial solely on the special damages issue.
 
 
 60
 AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.[19]
 
 TJOFLAT, Circuit Judge, dissenting:
 
 61
 The district court was confronted in this case with an arson fire. The question was who set the fire: T.D.S. Incorporated or some third party. Shelby Mutual Insurance Company had good and ample reason, founded on credible evidence, to believe that T.D.S. committed the arson. It therefore refused to pay the claim, relying on the venerable principle of insurance law that an insured should not profit from his unlawful acts.[1] The majority holds that an insurer can be held liable for punitive damages under the circumstances presented here, for as much as $2.1 million. The majority claims that its holding comports with the law of Florida. I find nothing in Florida law, much less in logic or common sense, that would countenance the majority's holding. I therefore dissent.
 
 
 62
 The jury's verdict was caused by the failure of the trial judge to come to grips with the issues in this case and to prepare them properly for trial. T.D.S.'s lawyer, John W. Berry, pled his case in such a way that one could hardly discern, at first blush, precisely what it was that he was claiming--beyond the conclusory allegations that Shelby Mutual, in refusing to honor its insured's proof of loss, had been guilty of "fraud," "recklessness," and "dishonesty." The case proceeded through discovery and to trial on these vague conclusory allegations despite Shelby's repeated efforts to get the court to make T.D.S. state its claims in a coherent, orderly manner, as the Federal Rules of Civil Procedure require.
 
 
 63
 In his opening statement to the jury, Berry told the jury practically nothing about T.D.S.'s claims. Rather, he focused his attention on the plight of Thomas and Dorothy Starr, T.D.S.' principals, as if they had brought the suit, describing the complaint against Shelby with this brief, cryptic statement:
 
 
 64
 The complaint, ladies and gentlemen of the jury, is pretty specific in what it charges with. It charges them with fraud, false pretenses, pretending to investigate, and other tortious things that are wrong, civil law. In law it's called a tort. Bias, prejudice, reckless presumption of guilt which resulted in an accusation of two people going into the retirement business, who are two of the finest people that their employees and neighbors had known in their lives. And it's for real, and they knew it.
 
 
 65
 Berry then set out to "try" Shelby and its lawyers for having the audacity to accuse the Starrs of arson. Most of the evidence he brought before the jury had absolutely nothing to do with the fundamental questions Florida law required it to decide: the extent of T.D.S.'s property loss (up to the $100,000 policy limit) and whether T.D.S. committed the arson. Shelby's repeated objections to this irrelevant evidence were overruled.
 
 
 66
 The trial court made no attempt to settle the issues in this case until it framed its final charge to the jury. Had the court attempted to settle the issues earlier, it would have recognized T.D.S.' claim that Shelby conducted a reckless and inadequate investigation of the fire and refused to pay T.D.S.' property loss without good cause as a "bad faith" claim proscribed by Florida law and struck it from the case. The court also would have found T.D.S.' fraud and deceit claim insufficient as a matter of law, and removed it from the jury, because T.D.S. could not have justifiably relied on any representations Shelby's agents or attorneys made to T.D.S. or the Starrs during the course of its fire investigation. Without these tort claims, T.D.S. could not have recovered punitive damages. As for T.D.S.' suit under the insurance policy, the court should have granted Shelby's motion to strike T.D.S.' claim for consequential damages. Having taken the foregoing action, all of which Shelby requested, the court would have reduced this controversy to what it should have been: a suit to recover the property damage proceeds of a fire insurance policy.
 
 
 67
 By substituting jury instructions for rulings that would have precluded the jury from considering T.D.S.' legally insufficient claims, the district court was unable to avoid what I consider to be a patent miscarriage of justice. As an issue-settling device, the court's charge came too late because the jurors had heard too much irrelevant and highly prejudicial evidence, and argument from plaintiff's counsel thereon, to be able to decide the case on that which was pertinent. The charge was inadequate because the court failed to instruct the jurors to disregard such evidence and argument and because much of it, particularly the instructions concerning T.D.S.' "fraud and deceit" claim, was incomprehensible. In consequence, plaintiff's counsel, in closing argument, presented the issues to the jurors on his terms: had a powerful and wealthy insurance company subjected two hardworking people, the Starrs, to tremendous personal suffering for the sake of a mere $100,000; if so, it should be punished, severely.
 
 
 68
 The majority, I submit, has compounded the trial judge's errors. This becomes clear when one analyzes the record in this case, from the beginning.
 
 I.
 
 69
 In 1979, Thomas and Dorothy Starr, then in their early fifties, moved to Bradenton, Florida to "retire" and also to fulfill their dream of operating their own restaurant. The Starrs came from Silver Spring, Maryland. Thomas had been a U.S. Army cook and, after retiring from the Army, had worked as a kitchen and cafeteria supervisor. Dorothy had worked for the federal government as a purchasing agent, sold real estate, and shortly before moving to Florida owned and operated a kindergarten.
 
 
 70
 The Starrs moved to Bradenton because they found a restaurant for sale there at the right price, the Lord & Lady Restaurant and King's Pub Lounge (the "Lord & Lady"), which was owned by Belfrap, Inc. The resources the Starrs had available to invest in the purchase of a restaurant, and to provide operating capital, were modest, $124,000 in bank deposits and $96,000 in real estate mortgages, but the price Belfrap was asking, $150,000, fell within these means. That price included all of the Lord & Lady's assets, the business' "good will," Belfrap's leasehold interest in the premises, and its option, renewable annually for five years beginning February 15, 1978, to purchase from Eugene R. Cohenour the building that housed the Lord & Lady.[2] Thus, a buyer could move in and continue operating the Lord & Lady with minimal business disruption.
 
 
 71
 Belfrap's offer was attractive to the Starrs, and they decided to accept it. They wanted to operate the Lord & Lady as a corporation, to limit their personal liability, so they hired attorney Arthur Vandroff to organize T.D.S. Incorporated and to handle the closing. The Starrs provided T.D.S. with the necessary capital and, on July 23, 1979, T.D.S. paid for and acquired the Lord & Lady. The Starrs, personally, acquired Belfrap's lease and option. T.D.S. paid Belfrap the $150,000 purchase price by giving it, at closing, $95,000 in cash and a promissory note for $55,000. T.D.S. raised $55,000 of the $95,000 cash payment by borrowing that sum from the Westside National Bank of Bradenton. The loan was secured by a mortgage on the Lord & Lady's furniture, fixtures, and equipment and the Starrs' guaranty.
 
 
 72
 The building that housed the Lord & Lady was a prefabricated structure measuring 86 by 140 feet. The restaurant and lounge were located in the eastern half of the building. Eugene R. Cohenour had a small warehouse in the northwest quarter of the building, which he permitted the Starrs to use, and a beauty salon occupied the southwest quarter.
 
 
 73
 T.D.S. purchased the Shelby Mutual multi-peril insurance policy involved in this suit the day it acquired the Lord & Lady. The policy provided a variety of coverages, including $100,000 in fire insurance for T.D.S.' personal property in the restaurant and lounge, including its leasehold improvements. The policy named Westside National Bank of Bradenton as a loss payee, to protect its security interest in the Lord & Lady's assets.
 
 
 74
 The Starrs, as T.D.S.' owners, officers, and principal employees, managed and operated the Lord & Lady restaurant and lounge from the moment T.D.S. acquired the business until the fire five and a half months later. Mr. Starr ran the kitchen and food service, and Mrs. Starr handled the finances. The Lord & Lady lost money from the moment it began operating under the new management until the outbreak of the fire, despite the fact that the Starrs drew no salary. By the time of the fire, T.D.S. had suffered a net loss in excess of $46,000. In December 1979, the last full month it was in business, T.D.S. lost $6,800 even though it catered more than twenty Christmas parties. The company's cash flow problem was even worse; during the five and a half months it operated the Lord & Lady it had a negative cash flow of over $97,000. The Starrs underwrote these losses by dipping into their savings. They soon realized that they had made a bad investment; they stood to lose their life's savings.
 
 
 75
 The fire occurred at 1:43 a.m. on Sunday, January 13, 1980. The restaurant had closed, but the lounge was still open, serving approximately twenty-five customers. Mr. Starr had been in the lounge most of the evening, and after the restaurant closed Mrs. Starr joined him. According to the Starrs, the fire broke out shortly after they went to their office (which was in the restaurant, adjacent to the dining room) to obtain a check to pay the band, which had just finished playing in the lounge. The office was locked, and the Starrs had the only keys to the door. Before they could open it, they noticed that the lights had gone out, so they returned to the lounge to see what was wrong. When they got there, the ceiling was afire. A waitress called the local fire department, and by the time the firemen arrived the fire had engulfed a substantial portion of the northern half of the building.
 
 
 76
 The department's fire marshal, Robert Kline, immediately requested the assistance of the State Fire Marshal. Deputy State Fire Marshal Joseph Ladika arrived on the scene at 4:00 a.m. He was a man of sixteen years experience in the Fire Marshal's office and, prior to that, considerable experience as a fireman and fire chief. Ladika concluded that the fire had been deliberately set, originating in the restaurant office, and had been fueled by an accelerant, a highly flammable material such as gasoline. Using a "sniffer," a device designed to locate accelerant vapor, he had picked up what he termed a "tremendous reading" at the west wall of the office.
 
 
 77
 The day after the fire, Shelby Mutual employed Equifax to investigate the origin and cause of the fire. Equifax assigned Gary Haun, Sr., who had previous experience in the Tennessee Fire Marshal's office, to the case. Working with Fire Marshal Kline, Haun conducted an examination of the premises, taking numerous photographs of the debris and the remains of the building's interior structures, and concluded that the fire originated in three places: the restaurant office, above the restaurant's kitchen (which was located next to the office), and the warehouse. Haun agreed with Deputy State Fire Marshal Ladika that the fire had been fueled by an accelerant; a "pour pattern" on the carpeting in the office, uneven burn patterns on several rugs in the warehouse, spalling on the cement floor in the warehouse, and severe spot burning in the kitchen ceiling pointed to such. Haun also noted that one could enter the warehouse from the restaurant through an interior door. The area above the kitchen ceiling (which was suspended) could be reached by removing an acoustic tile. Haun agreed with Ladika that the physical evidence pointed to arson.
 
 
 78
 The beauty salon was insured by American States Insurance Company. American States hired Systems Engineering Associates to investigate the origin and cause of the fire, and on January 23, Mervin Stringer examined the premises. Stringer was an experienced fire investigator; he had a bachelor's degree in chemistry, an associate's degree in fire technology, and prior experience as a fireman. He also found evidence of an incendiary fire in the restaurant office, over the kitchen and in the warehouse. Since there was no reason to suspect arson on the part of the beauty salon operator, because he had a profitable business, Stringer advised American States to pay the loss, which it did.
 
 
 79
 Two other experts eventually rendered opinions as to the origin and cause of the fire. Weldon Carmichael, a renowned fire expert and past president of the International Association of Arson Investigators whom Shelby retained prior to trial, opined that the fire had been deliberately set in three locations, including the restaurant office, and had been fueled by incendiary elements. Roland L. Kennedy, a fire investigator employed by T.D.S. after it brought this suit, admitted that the fire was of "suspicious cause," that it "looked funny," and that the hole burned into the office carpet was "similar to a pour pattern" an arsonist would create in starting a fire by lighting a flammable liquid. Kennedy, however, would not say that the office was a point of the fire's origin.
 
 
 80
 A day or so after the fire, Shelby Mutual retained Richard Wilson, an experienced arson attorney, to handle the property damage claims it anticipated T.D.S. and Eugene R. Cohenour, the owner of the building, would make. Cohenour also had fire insurance with Shelby Mutual. Cohenour filed a proof of loss for his policy limits, $125,000, and Shelby, having no reason to suspect that Cohenour was responsible for the fire, promptly paid it.
 
 
 81
 Shelby treated T.D.S.' proof of loss differently, however. On March 5, Wilson wrote Mr. Starr, T.D.S.' president, requesting a statement under oath. See Appendix, Exhibit A. Wilson's letter put T.D.S. and Starr on plain notice that Shelby Mutual suspected arson and that, if it became demonstrable that T.D.S. had set the fire deliberately, Shelby would deny coverage. At this point, Shelby and T.D.S. occupied an adversary debtor-creditor relationship, a quasi-litigation posture. See infra p. ----. Shelby had a contract right to depose Starr, and his wife as well, as the principal officers of its insured, and to examine them about the circumstances of the fire, including any motive they may have had to ignite it, and the Starrs should have expected Shelby to exercise that right. Moreover, their failure to provide Shelby with the information it requested[3] could forfeit T.D.S.' insurance coverage.
 
 
 82
 Wilson examined Mr. Starr under oath on March 26, 1980. He began by advising Starr and his lawyer, Arthur Vandroff, that Shelby had evidence of arson but was not yet able to identify the arsonist. He also told them that any misrepresentation Starr might make could operate to void the insurance coverage. Starr answered all the questions Wilson put to him and made no patently incriminating statements.
 
 
 83
 In early April, the Starrs terminated their lease. (They had already abandoned their option to purchase the building, having failed to make the $2,000 option payment due on February 15.) Shortly thereafter, Wilson examined Mrs. Starr under oath. Like her husband, she made no patently incriminating statements.
 
 
 84
 Shelby Mutual concluded that the Starrs had deliberately caused the fire. No one had doubted that the fire had been caused by arson. The primary focus of the investigation was to identify the arsonist. The evidence pointed to the Starrs, because they appeared to be the only ones who stood to benefit by the fire. The fire enabled them to cut their losses and to get out from under their lease. In addition to having a motive to set the fire, the Starrs had the only access to the locked restaurant office, one of the places where the fire started; they also had access to the other possible points of origin, the area over the kitchen and the warehouse. On June 18, Wilson wrote attorney Vandroff that Shelby was denying the claim because the Starrs had made several intentional misrepresentations in their sworn testimony with respect to their knowledge of the fire's origin and the value of the destroyed property. Though Wilson did not explicitly accuse the Starrs of arson, Vandroff already knew that Shelby had concluded that the Starrs were responsible for the fire, and he had discussed the case with a specialist on the subject, attorney John W. Berry.
 
 
 85
 In October 1980, attorney Berry commenced this action on behalf of T.D.S.[4] The complaint contained two counts. In the first count, T.D.S. made claim against Shelby for the $100,000 fire insurance coverage for the damage sustained to its personal property at the Lord & Lady. In the second count, T.D.S. sought punitive damages because of the manner in which Shelby had handled its policy claim. T.D.S. alleged that Shelby had a "duty of diligent and good faith efforts" to determine the cause and origin of the fire, that it had breached that duty by conducting a wholly inadequate investigation, and that its denial of T.D.S.' claim was "willful, reckless and without good cause." Count two attempted to state what is commonly called a "bad faith" tort claim, notwithstanding that Florida law prohibited an insured from collecting punitive damages from his insurer for rejecting his policy claim in bad faith. See infra Part II.A.
 
 
 86
 Attorney Berry's strategy in presenting this bad faith claim was obvious; Berry had to counteract Shelby's anticipated arson defense and divert the jury's attention to issues that would create sympathy for the Starrs. If he could succeed in persuading the district court that Florida law no longer foreclosed the type of bad faith claim he alleged, Berry could materially enhance the settlement value of his client's case. And if Shelby refused to settle, he could turn the trial into a critique of Shelby's investigation of the fire and its decision, based on Richard Wilson's recommendation, to deny coverage. In the process, he could delve into Wilson's work product and, in essence, make it virtually impossible, and unethical,[5] for Wilson to represent Shelby at trial. This, of course, is precisely what occurred. Finally, in proving the extent of the punitive damages the jury should award his client, Berry could introduce into evidence Shelby's financial statement and implore the jury to punish Shelby substantially for the suffering it had caused the Starrs. This, too, came to pass.
 
 
 87
 Shelby, represented by attorney Wilson, moved to dismiss the second count of T.D.S.' complaint, contending, correctly, that Florida law did not recognize the sort of bad faith tort claim the count presented and, further, that T.D.S. had not alleged facts establishing a separate, independent tort, one not rooted in Shelby's handling of T.D.S.' fire insurance claim. Berry countered Shelby's motion to dismiss by moving the court to grant T.D.S. a summary judgment on both counts of its complaint. Relying on his own affidavit, in which he stated that he was an arson specialist, Berry attempted to demonstrate that, as a matter of law, Shelby's anticipated "arson defense" was unfounded and that Shelby was liable to T.D.S. for the $100,000 policy limit and punitive damages.[6]
 
 
 88
 On August 27, 1981, the district court perfunctorily denied both parties' motions, and Shelby answered T.D.S.' complaint. Shelby's answer to count one of the complaint admitted the existence of the fire insurance coverage, but denied liability, in separate affirmative defenses, on the ground that T.D.S. had deliberately caused the fire and that the Starrs had deliberately concealed that fact in processing T.D.S.' proof of loss.[7] Responding to count two, Shelby denied that it had acted tortiously in processing T.D.S.' fire insurance claim and denying coverage, stating that its action was mandated by the investigative results reached by the State Fire Marshal's office and the other experts who had investigated the origin and cause of the fire and the Starrs' concealment of facts material to the fire loss.
 
 
 89
 After receiving Shelby's answer, T.D.S. filed several motions for summary judgment. Shelby successfully opposed each of these motions, presenting the affidavits of Deputy State Fire Marshal Ladika and the other experts, who had concluded that the fire had been caused by arson, and other circumstantial evidence indicating that the Starrs had a strong motive to burn the restaurant and lounge.
 
 
 90
 As the litigation progressed toward trial, Shelby, on several occasions, moved the court to sever T.D.S.' count two bad faith claim and to defer the disposition of that claim until after it disposed of the count one policy claim. Assuming arguendo that Florida law recognized such a claim, Shelby argued that the bad faith count, as it was then framed, would be mooted if Shelby presented an arson defense sufficient to go to the jury and that, in the interest of expediency and economy, the court should sever the counts. See Fed.R.Civ.P. 42(b). Although Berry agreed that count two would be moot if Shelby had a demonstrable arson defense,[8] he opposed Shelby's severance motions, arguing that the two counts should be tried together, since much of the evidence he planned to introduce at trial would be common to both. The court denied each of Shelby's requests for severance, without prejudice to Shelby's right to move for a severance if a new, compelling ground arose.
 
 
 91
 Shelby's final motion for severance presented such a ground. T.D.S.' bad faith claim, Shelby pointed out, constituted a tort that would continue throughout its defense of the case and would implicate not only the conduct of Shelby's claims department but that of its trial attorney, Richard Wilson, as well. This tort would continue until the legal sufficiency of Shelby's arson defense was finally resolved. If the court allowed the two claims to be tried together, Shelby argued, the court and jury would be required to focus on attorney Wilson's conduct in handling T.D.S.' fire loss prior to and during the litigation and Wilson, being a critical, material witness, would have to withdraw from the case.[9] The court refused to sever the counts, and Wilson accordingly withdrew. He was replaced by Fowler, White, Gillen, Boggs, Villareal and Banker, who tried the case and prosecuted this appeal.
 
 
 92
 Less than two weeks before the case was set for trial, Berry moved for leave to amend T.D.S.' complaint. Berry knew that his count two bad faith claim could not withstand scrutiny in the light of Florida precedent and that his prayer for punitive damages might be stricken from the case. He therefore tendered a revised count two which sought punitive damages on the theory that Shelby had committed the independent torts of slander, tortious interference with property rights, and "bad faith breach of fiduciary duty." The court denied his motion for leave to amend as untimely.
 
 
 93
 On September 27, 1982, the court called the case for trial. After an extended discussion with counsel, the court concluded "that the issues to be tried were wholly undefined" and struck the case from the trial calendar. The court also instructed T.D.S. to file an amended complaint, in an obvious attempt to isolate its claims and bring them to a triable posture.[10]
 
 
 94
 Attorney Berry filed the amended complaint as directed. Count one again demanded judgment for the $100,000 fire insurance coverage, but it also sought the recovery of a host of "special" or "consequential damages." They included the expenses T.D.S. had incurred in defending various suits by creditors, the expenses it had incurred in attempting to disprove Shelby's arson theory, the loss of good will and the injury T.D.S. had suffered to its credit reputation as a result of Shelby's bad faith handling of its fire insurance claim, and the value of the option (to purchase the building) the Starrs had abandoned. Count two sought punitive damages, alleging that Shelby had engaged in "bad faith conduct giving rise to the independent torts of breach of a fiduciary relationship, intentional interference with property rights, slander per se, fraud and deceit and reckless breach of an assumed duty."
 
 
 95
 In addition to reconstituting counts one and two, the amended complaint presented two new counts. The claimants in these counts were Thomas and Dorothy Starr. Berry added them as parties plaintiff, even though the court had not granted him leave to do so, and sought on their behalf the recovery of compensatory and punitive damages, alleging that Shelby had slandered them and caused them severe emotional distress.
 
 
 96
 Shelby moved to dismiss the amended complaint on the grounds, among others, that the complaint failed to state a claim for relief, that the complaint failed to constitute "a short and plain statement of the claim showing that the pleader is entitled to relief," as Fed.R.Civ.P. 8(a)(2) requires, and that Berry had failed to obtain leave of court before adding the Starrs as parties plaintiff. See Fed.R.Civ.P. 21.[11] The court granted Shelby's motion in part, dismissing the Starrs' claims as untimely and instructing T.D.S. to replead its claims in a new amended complaint.[12] The court also directed Shelby to answer[13] such amended complaint within ten days, indicating that it would promptly take the case to trial on the issues joined by those pleadings.
 
 
 97
 T.D.S. filed its repleader, a third amended complaint, and Shelby answered as directed, raising the defenses it had presented earlier. Shelby also filed a counterclaim, seeking the recovery of the $125,000 it had paid to Eugene R. Cohenour under his fire insurance policy, and T.D.S. responded with a general denial.
 
 
 98
 T.D.S.' third amended complaint contained two counts, each of which contained a myriad of claims. Attorney Berry apparently read the district court's order directing him to replead his case, and Shelby to answer it, as a statement that the case would proceed to trial on the claims he presented in his repleader regardless of their legal sufficiency and his compliance with the Federal Rules of Civil Procedure favoring the presentation of claims, or causes of action, in separate paragraphs or counts and in "short and plain statements," see Fed.R.Civ.P. 8(a) and 10(b), because he treated the court's order as a license to disregard these rules.[14] A reading of the third amended complaint, which I have set out in the Appendix as Exhibit B, makes this clear.
 
 
 99
 The pleading contains two counts. In the first count, Berry attempted to raise a myriad of claims, among them a simple breach of contract (Shelby's liability for the $100,000 in fire insurance proceeds) and several torts. The torts allegedly came into being on the "date of the fire loss" and continued "to the present." They included the common law torts of fraud and deceit (false statements by Shelby during the course of its investigation that T.D.S. allegedly relied on to its detriment), libel, slander, and defamation (presumably Shelby's implied statement, in denying T.D.S.' claim, that the Starrs had set the fire), and deliberate interference with T.D.S.' "credit and business reputation" (purportedly caused by Shelby's implied statement that the Starrs were responsible for the fire), and a statutory tort, under Florida's Unfair Insurance Trade Practices Act, Fla.Stat. Sec. 626.9541 (1984). The first count, in paragraph 12, sought various special damages for Shelby's "willful breach of contract" and "tortious misconduct," including the loss of "a valuable option to purchase the building," "a valuable business opportunity," "business and credit reputation," and "litigation expenses" (presumably incurred by T.D.S. in defending several lawsuits brought against it by third parties between the date of the fire and the filing of the third amended complaint because its business had collapsed).
 
 
 100
 In addition to combining a variety of discrete claims in one count in such a way as to make it difficult to discern which allegations or damages pertained to which theory of recovery, attorney Berry improperly included the Starrs' claims the court had stricken from the case earlier, such as their claims for libel, slander, and defamation and their claim that Shelby's breach of its insurance contract with T.D.S. caused them to terminate their lease to the Lord & Lady premises and to forfeit their option to purchase Cohenour's building.
 
 
 101
 In count two of his third amended complaint, Berry repled the allegations of count one and expanded on the plaintiff's common law tort claims of fraud and deceit, libel, and slander. Ignoring strong Florida precedent to the contrary, see infra Part II.A., Berry also alleged that T.D.S.' insurance contract with Shelby "created a fiduciary relationship" between the parties,[15] that Shelby, in investigating and handling T.D.S.' fire loss, had breached its fiduciary duty to T.D.S., and that the breach continued to the present. Berry's allegation, in both counts, that Shelby's unlawful conduct was of a continuing nature and embraced the entire lawsuit, including the trial, set the stage for Berry to criticize Shelby's trial strategy before the jury, something that obviously had no bearing on the important threshold questions of whether the Starrs had set the fire and/or deliberately concealed from Shelby material facts about the fire and the extent of T.D.S.' property loss.
 
 
 102
 The case proceeded to trial on this third amended complaint.[16] The trial judge gave the parties ninety-six hours in which to try the case. Under this format, the plaintiff could take whatever portion of that time it needed to put on its case in chief; the defendant could have the rest.[17] The plaintiff's case in chief consumed all but two and a half days worth of these ninety-six hours, concluding on a Monday evening at about suppertime.
 
 
 103
 In presenting the plaintiff's case, Berry took full advantage of the broad, all-encompassing allegations of his third amended complaint. He began by telling the jury, in his opening statement, that the case involved "one of the most reckless fire investigations known to the fire industry" and that it would be asked to assess punitive damages against Shelby for "conduct [toward the Starrs] that was truly unbelievable." And his evidence addressed this theme. The Starrs were portrayed as honest, hardworking folk who had come to Florida to pursue the American dream and had been done in by a callous multimillion dollar insurance company that was willing to defame them, with false accusations of arson and fraudulent concealment, simply to avoid paying a $100,000 fire loss. Over defense objection, the jury was told of the anxiety and emotional distress the Starrs had endured and the losses they and T.D.S. had incurred because of Shelby's "tortious" conduct. According to Mrs. Starr, Shelby's conduct had destroyed a going business worth $225,000 at the time of the fire.
 
 
 104
 The Starrs, flatly denying any involvement in the fire, told the jury how they relied to their detriment on Shelby's false representations, particularly those of its lawyer, Richard Wilson, that it was investigating the origin and cause of the fire, that it had uncovered no information which implicated them or any other T.D.S. employees, and that, if it acquired such information, it would confront them with it. Berry called Richard Wilson to the stand and cross-examined him about these representations (which he denied making). He also probed Wilson in depth about the advices he gave Shelby as his investigation of the fire progressed. Finally, Berry delved into the thought processes behind Shelby's decision to deny coverage and the litigation strategy Wilson employed in Shelby's behalf as this case proceeded to trial. The court overruled Shelby's objection to this line of inquiry, agreeing with Berry that Wilson's testimony was relevant, and admissible, because Shelby was on trial not only for what it had done to T.D.S. and the Starrs in handling the fire loss, but for the manner in which it had been, and was, handling the litigation. In short, the court permitted the plaintiff insured to litigate a bad faith tort claim, which Florida law forbade, along with its policy claim.
 
 
 105
 When the plaintiff rested, both parties moved for a directed verdict. Since the dinner hour had arrived and the court wanted Shelby to begin its case after supper, it deferred the argument on those motions until the following morning. Shelby's counsel objected to this procedure, arguing that he needed a few hours to line up his witnesses, but his objection was overruled. Shelby's defense began that evening and concluded two days later, at about noon.
 
 
 106
 After lunch, the court ruled on the parties' motions for directed verdict, denying them, and completed the charge conference it had begun that morning before the jury assembled. During that conference, the court did a complete about-face with respect to the plaintiff's bad faith claim. It finally accepted Shelby's argument that Florida did not recognize the right of an insured to sue its insurer for handling its policy claim in bad faith. Contrary to the position the plaintiff had maintained throughout the case, the insured's contract did not make Shelby T.D.S.' fiduciary; rather, Shelby and T.D.S. occupied a debtor-creditor relationship. The court also agreed with Shelby that, to recover against it in tort, T.D.S. had to make out an "independent" tort, such as fraud and deceit, libel, or slander, arising out of Shelby's breach of some duty not created by the insurance contract. The court, apparently reflecting on the record before it, opined that the only independent tort the evidence established was fraud and deceit. The court concluded the conference by stating that, with respect to the plaintiff's count two tort claim, it would only instruct the jury on the law of fraud and deceit.[18] Attorney Berry tacitly agreed to this limitation.[19]
 
 
 107
 In his closing argument to the jury which followed, Berry focused, as he had in his opening statement, on the economic losses and emotional stress the Starrs had sustained at Shelby's hands and the need for the jury to punish Shelby accordingly. The jury responded, awarding T.D.S. the full amount of its insurance claim, $100,000, $420,000 in special damages, and $2.1 million in punitive damages.
 
 
 108
 Shelby moved for a judgment n.o.v., attacking the sufficiency of the evidence to support both counts of the plaintiff's third amended complaint. Shelby also moved for a new trial, contending that the trial of counts one and two together created undue prejudice to Shelby's defense of T.D.S.' insurance claim. Shelby's motions were denied, and, following the court's entry of judgment in accordance with the jury's verdict, it took this appeal.
 
 
 109
 The district court should have granted Shelby a judgment n.o.v. as to T.D.S.' count two tort action because, as a matter of law, the record did not disclose an actionable tort. With respect to T.D.S.' count one breach of contract claim, the court should have reduced T.D.S.' $520,000 recovery by $432,000. $420,000 of that recovery represented certain consequential or special damages not cognizable under Florida law in a suit on a fire insurance policy such as the one before us. $12,000 of that amount represented destroyed leasehold improvements; since T.D.S. had no leasehold interest in the premises (the Starrs having the lease), it could have had no insured leasehold improvements.
 
 
 110
 Having taken this action, the district court should have granted Shelby a new trial on T.D.S.' count one claim for the fire insurance proceeds. Shelby is entitled to a trial on that claim, and its arson and deliberate concealment of material fact defenses, that is free of the irrelevant and highly prejudicial evidence the trial judge permitted the plaintiff to bring before the jury in this case. In the discussion that follows, I address, in sequence, the legal sufficiency of T.D.S.' count two tort claim(s), its count one claim under the policy, and the necessity for a new trial.
 
 II.
 
 111
 Though the trial court, in its charge conference with counsel, finally concluded that Florida did not recognize the bad faith tort claim T.D.S. had been pressing throughout the proceedings, it inexplicably presented such a claim to the jury. The court also charged the jury on fraud and deceit. Both claims must be examined, therefore, in assessing the legal sufficiency of count two.
 
 A.
 
 112
 The court, in charging the jury on count two, instructed it that T.D.S. could recover punitive damages if the jury concluded that Shelby should have paid T.D.S.' fire insurance claim (meaning that the jury rejected Shelby's affirmative defenses of arson and deliberate concealment of material fact) and that Shelby's refusal to pay it "amounted to deliberate, overt, and dishonest dealings."[20] This instruction, I submit, placed before the jury a bad faith tort claim heretofore unrecognized by the Florida courts or any other jurisdiction.
 
 
 113
 In some jurisdictions, but not in Florida, an insured can sue his insurer in tort for refusing in "bad faith" to pay his policy claim. To recover, the insured must demonstrate that the insurer had no lawful basis for its action. See, e.g., Pirkl v. Northwestern Mutual Insurance Association, 348 N.W.2d 633 (Iowa 1984); Hoskins v. Aetna Life Insurance Co., 6 Ohio St.3d 272, 452 N.E.2d 1315 (1983); National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982); Gruenberg v. Aetna Insurance Co., 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973). See Southeast Nursing Home v. St. Paul Fire & Marine Ins. Co., 750 F.2d 1531 (11th Cir.1985). For example, in the factual context presented here the insured must establish that, as a matter of law, the insurer had no basis for its arson and deliberate concealment of material fact defenses. He does this by producing a judicial ruling, usually a summary judgment or a directed verdict, to that effect. The judicial ruling triggers the insured's bad faith claim; it is the sine qua non. In charging the jury on T.D.S.' bad faith claim in this case, the district court added a gloss to this triggering element. It allowed the insured to recover notwithstanding the presence of two valid policy defenses. All the insured had to do was convince the jury to reject those defenses, i.e., to conclude that Shelby had not discharged its burden of proving them by a preponderance of the evidence.[21] The court's instruction, as I have stated, described a tort claim foreign to the law of Florida or any other state.
 
 
 114
 Under Florida law, an insured has no tort action, and therefore cannot recover punitive damages, against his insurer for refusing to pay his insured loss even if the refusal is groundless and in "bad faith." Industrial Fire & Casualty Insurance Co. v. Romer, 432 So.2d 66, 67 (Fla.Dist.Ct.App.1983); Smith v. Standard Guaranty Insurance Co., 435 So.2d 848, 849 (Fla.Dist.Ct.App.1983) (punitive damages not justified even though insurer's conduct was "callous," "bungling and arbitrary"); Allstate Insurance Co. v. Gibbs, 340 So.2d 1202, 1204 (Fla.Dist.Ct.App.1976) ("[a]n insuror's [sic] bad faith refusal to settle a claim of its insured is not per se a willful and independent tort...."); MacDonald v. Penn Mutual Life Insurance Co., 276 So.2d 232, 233-34 (Fla.Dist.Ct.App.1973). In sum, an insured cannot make out a claim for punitive damages even though the insurer's refusal to pay is willful, flagrant, malicious, or motivated by spite or ill will. Baxter v. Royal Indemnity Co., 285 So.2d 652, 657 (Fla.Dist.Ct.App.1973), cert. discharged, 317 So.2d 725 (Fla.1975); Romer, 432 So.2d at 67.
 
 
 115
 This rule is nothing more than a particular application of the common law rule in Florida that punitive damages will not be awarded in a breach of contract action unless the breach is accompanied by some "intentional wrong, insult, abuse or gross negligence that amounts to an independent tort." Griffith v. Shamrock Village, 94 So.2d 854, 858 (Fla.1957). See also Associated Heavy Equipment Schools, Inc. v. Masiello, 219 So.2d 465, 467 (Fla.Dist.Ct.App.1969); Maco Supply Corp. v. Masciarelli, 213 So.2d 265, 266-67 (Fla.Dist.Ct.App.1968), affirmed in part, vacated in part, and remanded on other grounds, 224 So.2d 329, 330 (Fla.1969); Fountainebleau Hotel Corp. v. Kaplan, 108 So.2d 503, 505-06 (Fla.Dist.Ct.App.1959). As the Florida Supreme Court reiterated recently in Lewis v. Guthartz, 428 So.2d 222, 223 (Fla.1982), the reason for this requirement is the "unwillingness to introduce uncertainty and confusion into business transactions as well as the feeling that compensatory damages as substituted performance are an adequate remedy for an aggrieved party to a breached contract."
 
 
 116
 The controversy in this case is a first party insurance claim; an insured seeks to recover the proceeds of an insurance policy from its insurer. The "bad faith" rule applicable to first party insurance claims should not be confused with the one that applies to third party claims. In the latter, the insurer is liable to its insured for punitive damages when it fails to defend or negotiate a settlement for the insured in good faith. The insurer's liability arises because it stands in a fiduciary relationship with the insured. As the court explained in Baxter, 285 So.2d at 655: "The relationship between the parties ... is ... much akin to that of attorney and client." The insurance contract "provides that the insurer will defend the insured in any action brought against him, and complete control of the litigation is vested in the insurer. The insured binds himself to cooperate fully with the insurer and to neither negotiate for nor settle the claim against him without the insurer's knowledge and consent." Id. When the insured is attempting to collect on his policy, however, he and his insurer stand in an adversarial, creditor-debtor relationship. Consequently, his insurer owes him no fiduciary duty and cannot be held liable, in contract or in tort, for not exercising good faith in processing his claim. Id. at 656-57.
 
 
 117
 The preclusion of a bad faith tort claim in an insured's first party suit against his insurance company to collect on a fire loss serves many important state policies. First, and foremost, it deters arson. An insured who has committed arson is more likely to sue his insurer for the insurance proceeds and to obtain a settlement or jury verdict if he can prosecute a bad faith claim at the same time. If the insured can try these claims together, the bases for admitting evidence, and, hence, his chances of confusing the jury and prejudicing its treatment of the insurer, will be far greater than they would be were he restricted to a suit on his policy. This case is a perfect example. Had the court limited the trial to T.D.S.' property loss,[22] the plaintiff's case in chief could have been presented in a few hours; moreover, most of the testimony the jury heard would have been inadmissible, including the testimony of Richard Wilson about the advices he gave his client and his litigation strategy. The parties having stipulated to the admissibility into evidence of T.D.S.' insurance policy, the plaintiff would have proceeded to show the value of its insured property consumed in the fire and then rested its case.
 
 
 118
 Shelby's defense would have focused on the origin and cause of the fire. The jury's attention would have been drawn to the eyewitness accounts of the fire, the post-fire examination of the scene, and the experts' opinion testimony as to where the fire started and what caused it. The defense would also have focused on who caused the fire and the Starrs' motive for setting it. In its rebuttal, if any, T.D.S. would have advanced its theory as to how and why the fire started.
 
 
 119
 Had the district court's bad faith instruction expressed the law of Florida at the time of the fire in this case, Shelby Mutual would have settled this case long before it got to the courthouse. The fact that the evidence indicated that its insured probably set the fire and that it was sufficient to make out a case of arson for the jury would have mattered little, because, under the district court's view, T.D.S. could collect punitive damages in spite of Shelby's valid arson defense.[23] Shelby simply could not have run the risk of a multimillion dollar verdict, especially if it could avoid that risk by paying T.D.S. $100,000.
 
 
 120
 Shelby would have settled for another reason, one unrelated to its potential liability for punitive damages. T.D.S.' bad faith claim was a continuing tort. According to T.D.S., it began with the fire and continued "to the present." This is why the district court allowed T.D.S. to examine Shelby's lawyer, Richard Wilson, about his communications to and from his client and his litigation strategy. Under T.D.S.' and the district court's continuing tort theory, which today this court sanctions by affirming T.D.S.' punitive damages award, T.D.S. could have called Shelby's trial lawyers, William A. Gillen and A. Donald Cox, to the stand and cross-examined them (as adverse parties) about their trial strategy, up to that very moment and, perhaps, even beyond. Shelby would have weighed the expense of such harassment in considering whether to honor T.D.S.' proof of loss and would have concluded that the plaintiff could effectively deprive it of its day in court.
 
 
 121
 The Florida rule precluding a bad faith claim in this situation allows the insurer to have its day in court without paying the sort of penalty imposed here. As I have pointed out supra, even those jurisdictions that recognize a bad faith claim do not do so until the insured has obtained a judicial determination that, as a matter of law, the insurer had no lawful basis for refusing to pay. This rule, like Florida's, allows the insurer to litigate a valid, demonstrable policy defense without fear of penalty and to do so with a lawyer who cannot be shackled, or, as here, removed from the case, by the insured's threats to call him as a material witness or even to sue him for fraud and deceit. It thus enables a fire insurer to assume its proper role in the enforcement of the law against arson. It stands to reason that encouraging fire insurance companies vigorously to investigate fire losses, especially those caused by arson, and to resist payment in those instances in which there is a demonstrable arson case against the insured should deter arson and fraudulent attempts to collect fire insurance proceeds.
 
 
 122
 The majority's approval of a punitive damages award based on the "bad faith" jury instruction delivered in this case, punishes an insurance company for taking a strong stand in an arson case. It also punishes society. In time, the jury verdict here and in the cases that inevitably will follow, especially in the federal district courts in Florida, will be reflected in the fire insurance rates. In short, the public will bear the cost of this "fledgling tort" the majority embraces and the verdicts it spawns. The public will bear an additional burden as well: some insurance companies will cease underwriting fire risks and many law-abiding citizens will go without coverage. The district court, I conclude, transgressed the law of Florida and committed manifest error in submitting T.D.S.' bad faith claim to the jury.
 
 B.
 
 123
 The district court also erred in submitting T.D.S.' fraud and deceit claim to the jury. The elements of fraud and deceit under Florida law are the same as those at common law,
 
 
 124
 (1) a false statement concerning a specific material fact; (2) a showing that the representer knew, or should have known, that the representation was false; (3) an intention that the representation induce another to act on it; and (4) consequent injury to the party acting in justifiable reliance on the representation.
 
 
 125
 Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1103 (11th Cir.1983). See, e.g., Cavic v. Grand Bahama Development Co., 701 F.2d 879, 883 (11th Cir.1983); Banco Nacional de la Vivienda v. Cooper, 680 F.2d 727, 730 (11th Cir.1982); Suntogs of Miami, Inc. v. Burroughs Corp., 433 So.2d 581, 585 (Fla.Dist.Ct.App.1983).
 
 
 126
 The fourth element, "justifiable reliance," assumes that the party claiming fraud had a right to rely upon the misrepresentation in question. Pettinelli v. Danzig, 722 F.2d 706, 709 (11th Cir.1984). "[N]ot every false representation constitutes fraud on which a claim for relief can be based." Greenwald v. Food Fair Stores Corp., 100 So.2d 200, 202 (Fla.Dist.Ct.App.1958). See Columbus Hotel Corp. v. Hotel Management Co., 116 Fla. 464, 156 So. 893, 901 (1934) ("[t]o be remedial, a representation must have been of such a nature and made under such circumstances that the injured party had a right to rely upon it "); Bruce v. America Development Corp., 408 So.2d 857, 858 (Fla.Dist.Ct.App.1982) ("[f]or a complaint to state a cause of action for misrepresentation, there must be a right to rely"). The majority apparently believes that fraud and deceit can be established without proof of justifiable reliance; all the plaintiff need show is conduct amounting to "deliberate, overt and dishonest dealings." Ante note 1530. I find no support in the Florida law for such a proposition, and the majority has cited none.
 
 
 127
 T.D.S. claimed that Shelby, acting through its representatives, principally Richard Wilson, who were handling T.D.S.' fire loss, made four false statements of material fact to T.D.S. prior to denying liability for the loss: (1) that Shelby was conducting an investigation into the origin and cause of the fire, (2) that it would share with T.D.S. any information it obtained from its investigation, (3) that it had no information implicating T.D.S. in arson, and (4) that it would confront T.D.S. with any information implicating T.D.S. in arson.[24]
 
 
 128
 I will assume, for sake of argument, that all four utterances were statements of material fact,[25] that they were false and Shelby knew them to be such, that they were made with the intent that T.D.S. act on them, and that T.D.S. did so to its disadvantage. T.D.S. still failed to make out a case of fraud and deceit; for its reliance on the statements could not have been justified. This is because T.D.S. and Shelby, at the time the statements were made, occupied an adversarial relationship and T.D.S. was not entitled to rely on the truth thereof. Shelby was in the process of determining whether T.D.S., acting through its officers or employees, had committed arson, and the Starrs, and therefore T.D.S., were fully aware of this fact. Florida law allows no recovery for one who relies on his adversary's false statements under these circumstances.
 
 
 129
 In Columbus Hotel Corp. v. Hotel Management Co., supra, for example, the Florida Supreme Court held that the plaintiffs could not rescind a contract allegedly procured by fraud because they had no right to rely upon the defendant's misrepresentations. The misrepresentations had been made during settlement negotiations, in the midst of threatened litigation. The court concluded that
 
 
 130
 even if the alleged misstatements and false representations ... had been made, as charged by the complainants, prior to the making of the contract sought to be rescinded, the circumstances shown by the evidence to have existed at the time of the execution of that contract were such that the [complainants] had no right to rely upon any such representations, in view of the fact that the parties were informed and must have understood at all times that they were in hostile relations to each other and were dealing at arm's length.
 
 
 131
 156 So.2d at 901. In my view, this describes the relationship between T.D.S. and Shelby when the fraud alleged here occurred. And the supreme court's final words on the reliance issue also apply to the case at hand. "There can be no ground for complaint against representations where the hearer lacked the right to rely thereon, because he had reason to doubt the truth of the representation, as where ... a party ... was obviously hostile to the hearer and interested in misleading him." Id.
 
 
 132
 We have followed this Florida rule in a similar factual context, holding that adverse parties negotiating a settlement in an attempt to avoid litigation have no right to rely upon the representations of one another. Pettinelli v. Danzig, 722 F.2d 706 (11th Cir.1984). In Pettinelli, several disgruntled stockholders of a land development corporation requested the board of directors to bring a stockholders' derivative suit against itself. The board, comprised substantially of the targets of the stockholders' complaints, declined to sue, saying that a suit would have an adverse impact on the company. In due course, the stockholders and the board settled their dispute. The stockholders then sued some of the board members, alleging that the latter had fraudulently induced them to settle. Id. at 707-08. Citing Columbus Hotel Corp., supra, Judge Fay, writing for the court, held that the complainants "failed to make a prima facie case of fraud because they had no legal right to rely on any representations under these circumstances." Pettinelli, 722 F.2d at 710. He said that the parties, each represented by counsel, had been in an adversarial relationship with one another throughout the settlement negotiations; thus, the stockholders could not justify their reliance upon the board members' representations. Id. at 710. Cf. Smith v. Holley, 363 So.2d 594 (Fla.Dist.Ct.App.1978) (party in dispute over inheritance, seeking rescission of a settlement agreement based upon fraudulent failure to disclose, must plead sufficient facts to establish duty to disclose in order to survive a motion to dismiss, "especially in light of the fact that at the time the agreement was executed, the parties were adversaries in contested litigation").
 
 
 133
 There can be no question that T.D.S. and Shelby were adversaries from the time the Lord & Lady Restaurant burned, since it became evident at the very outset that T.D.S. would make a first party claim against Shelby for the $100,000 fire insurance proceeds. In this setting, "the interests of the insurer are wholly adverse to those of its insured as to every facet of a claim." Baxter v. Royal Indemnity Co., 285 So.2d 652, 656 (Fla.Dist.Ct.App.1973), cert. discharged, 317 So.2d 725 (Fla.1975). See also Smith v. Standard Guaranty Insurance Co., 435 So.2d 848, 849 (Fla.Dist.Ct.App.1983).
 
 
 134
 The testimony at trial made this clear. It firmly established that the Starrs, and therefore T.D.S., had every reason to doubt any representation Shelby might make that they were not arson suspects. The Starrs knew that Deputy State Fire Marshal Ladika came to the scene, while the embers were still smoldering, because the fire was suspicious. His report, issued in early February and readily available to T.D.S. and the Starrs, was particularly damning, stating that the fire had originated in the Starrs' private office. Mr. Starr admitted that he knew he was an arson suspect as early as two days after the fire, when he spoke with Gary Haun, Shelby's arson investigator. If Mr. Starr had any doubt as to his suspect status, the doubt was removed on March 5, prior to the first of the four alleged misrepresentations, when he, and his wife, were informed that Shelby Mutual had retained Richard Wilson, an experienced arson attorney, to assist in Shelby's investigation of the fire loss. Shortly thereafter, Wilson notified Mr. Starr that he intended to examine them under oath about the loss. See Appendix, Exhibit A. Wilson made it plain that Shelby believed that someone had intentionally set the fire, and he advised Mr. Starr that his attorney should be present during the examination. Wilson requested Mr. Starr to produce every conceivable piece of financial information about T.D.S.' business that would aid him in evaluating the merits of T.D.S.' claim. The examination was exhaustive. All indications were that Shelby suspected the Starrs of arson and that it would not decide whether to honor T.D.S.' proof of loss until it had concluded an extensive investigation. In this adversarial, quasi-litigation context, T.D.S. and the Starrs, as a matter of law, had no right to rely upon Wilson's representations or those of any other Shelby representative.
 
 
 135
 The district court should have struck T.D.S.' fraud and deceit claim from its third amended complaint. Failing that, the court should have granted Shelby's motion for directed verdict at the close of the plaintiff's case in chief. At the very least, the court should have removed the case from the jury at the close of all the evidence or set aside its verdict. In that T.D.S. failed to make out a cause of action for any tort, I would instruct the district court to enter a judgment n.o.v. on count two of the plaintiff's third amended complaint.
 
 III.
 
 136
 The district court denied Shelby's motions for a directed verdict and judgment n.o.v. on T.D.S.' count one insurance contract claim. Shelby argued several grounds in support of its motions; only one remains of concern:[26] whether the district court erred in allowing the jury to award T.D.S. "consequential or special" damages measured by "the value of the restaurant and lounge." Ante at 1533 - 1534.
 
 
 137
 The majority upholds the jury's compensation of T.D.S. for the value of the Lord & Lady under the doctrine of Hadley v. Baxendale,[27] on the strength of Mrs. Starr's testimony that the Lord & Lady was worth $225,000 immediately prior to the fire and the astonishing notion that Shelby's conduct somehow destroyed it.
 
 
 138
 Such compensation cannot stand for two reasons. First, not under the most liberal application of the Hadley v. Baxendale doctrine could one say that the parties, in contracting for the multi-peril insurance policy, contemplated that Shelby's failure to pay T.D.S. a personal property claim, following a fire that destroyed the Lord & Lady and the building that housed it, would cause T.D.S. to close its business. Second, Mrs. Starr's testimony that the Lord & Lady was worth $225,000 on the eve of the fire was not worthy of belief.
 
 
 139
 At the time T.D.S. purchased its multi-peril policy from Shelby, it selected a variety of coverages;[28] the only fire insurance it bought was the personal property coverage involved in this suit. The parties contemplated that, in the event a fire consumed Eugene R. Cohenour's building and destroyed the Lord & Lady, Shelby would pay T.D.S. up to $100,000 for damage to its personal property, unless it appeared that T.D.S. had deliberately caused the fire or concealed from Shelby material facts about the loss. In such a case, which is the scenario that developed here, T.D.S. would have to decide whether to accept Shelby's rejection of its proof of loss or bring suit on the policy. Only after it brought suit and prevailed would T.D.S. receive reimbursement for its property loss.
 
 
 140
 Reimbursement for its property loss, up to $100,000, plus whatever interest thereon Florida law would allow, is all that T.D.S. could ever have expected to obtain from Shelby. T.D.S. harbored no expectation that Shelby could also be made to pay it "consequential or special damages," merely because the jury rejected Shelby's policy defenses and made it whole for its property loss. To recover consequential or special damages would be to punish Shelby for exercising an important contract right and, as well, discharging its obligation to its policyholders and the general public to resist the payment of an arson loss caused by its insured, and that would be wholly unreasonable. Put another way, had T.D.S. informed Shelby, before purchasing the fire insurance in this case, that it would seek to recover the value of its business if Shelby denied liability on the grounds of arson or deliberate concealment of material fact, the insurance would not have been written. In sum, T.D.S. knew full well what would happen to its business if a fire consumed Cohenour's building and the Lord & Lady. The Lord & Lady would close and would not reopen until its facilities were rebuilt or it moved to another location, and T.D.S. alone would suffer whatever losses flowed from such business interruption.[29]
 
 
 141
 A common sense analysis of T.D.S.' financial picture at the time of the fire counsels against holding Shelby responsible for the destruction of the Lord & Lady as a going business enterprise. Immediately before the fire, T.D.S. had the following assets: cash in the bank and accounts receivable, personal property in the restaurant and lounge presumably worth no more than $100,000, and "goodwill." It also had substantial debts which it was having extreme difficulty paying because of its poor cash flow position. Immediately after the fire, T.D.S. had the same assets and liabilities, with one exception. Instead of personal property it had a property insurance claim against Shelby of up to $100,000. In short, Shelby had destroyed none of T.D.S.' assets.
 
 
 142
 By the time this suit went to trial, T.D.S. still had the same assets, but its debt picture had worsened. T.D.S. and the Starrs were fighting off their creditors, and they had insufficient capital, or borrowing power, to move the Lord & Lady to a new location. If T.D.S. was going to look to Shelby to compensate it for the value of its business, it had a duty to mitigate its damages. It could have done so, but did not. For example, it could have sold its goodwill, and the name "Lord & Lady," to someone else. If, as Mrs. Starr testified, the Lord & Lady was worth $225,000 at the time of the fire, and $100,000 of that amount consisted of personal property (all insured), the goodwill must have been worth $125,000 (less the company's cash and receivables). T.D.S. could have sold the goodwill or kept it; it chose to keep it and thus cannot demand compensation for it. That leaves the property damage claim. As for it, all T.D.S. has lost, as I have stated, is whatever interest the law provides.
 
 
 143
 Assuming arguendo that Florida law would allow T.D.S. to recover the value of its business at the time of the fire, I suggest that T.D.S. offered no competent evidence of that value. The majority finds Mrs. Starr's testimony, that the Lord & Lady was worth $225,000 prior to the fire, sufficient to prove value. I do not.
 
 
 144
 Belfrap, Inc., bought the Lord & Lady in February 1978 for $175,000 and thereafter made substantial capital improvements. But within two months, Belfrap had the Lord & Lady up for sale; the return on its investment was inadequate. The price was $240,000; there were no takers. By June 1979, Belfrap had lowered its price to $200,000. In that month the Starrs offered Belfrap $160,000 for the restaurant and lounge. Belfrap rejected the offer. In July 1979, the Starrs offered $150,000; it was accepted.
 
 
 145
 The Starrs took over a failing business and, as I have recounted in Part I., supra, the business continued to lose money under their management. Mrs. Starr's statement that the value of the business increased by $75,000 over the five and a half months they ran it is patently self-serving, has no support in the record and cannot be justified by any of the traditional methods of business valuation. The Lord & Lady had no earnings to capitalize; all it had after the fire was, as I have suggested, some cash, a few receivables, a fire insurance claim, and "goodwill." It still has those items; consequently, it has suffered no "consequential or special" damages.
 
 IV.
 
 146
 Shelby moved the district court alternatively for a new trial, citing numerous prejudicial errors. The district court denied the motion. I would reverse, holding the court's denial to be an abuse of discretion.
 
 
 147
 Shelby was entitled to a fair trial on T.D.S.' fire insurance claim for property damage and its affirmative defenses. It did not receive a fair trial. Rather, the jury heard highly prejudicial evidence and argument of counsel on claims the law does not countenance and was never told to disregard the same in deliberating its verdict on T.D.S.' fire insurance claim.
 
 
 148
 Recapitulating, I would instruct the district court to enter a judgment n.o.v. in favor of Shelby Mutual on all of T.D.S.' tort claims and T.D.S.' $420,000 jury award for consequential and special damages and to grant Shelby a new trial on T.D.S.' fire insurance claim for property damage.
 
 APPENDIX
 Exhibit A
 
 
 March 5, 1980
 CERTIFIED, RETURN
 RECEIPT REQUESTED
 
 
 Mr. Thomas J. Starr, President
 T.D.S. Inc. d/b/a
 Lord & Lady Restaurant
 
 149
 4411 101st Street W.
 
 Bradenton, Florida 33505
 Re: Insured: T.D.S. Inc. d/b/a
 Lord & Lady Restaurant
 Policy #: AIP SMP 6623515C
 D/L: 1/12/80
 Dear Mr. Starr:
 
 150
 This letter is to advise you that I have been retained by Shelby Mutual Insurance Company to assist in its investigation of your fire loss. Your policy provides in pertinent part as follows:
 
 
 151
 "9. Duties of the Named Insured After a Loss. In case of loss the named insured shall:
 
 
 152
 (a) give immediate written notice of such loss to the Company;
 
 
 153
 (b) protect the building and personal property from further damage, make reasonable temporary repairs required to protect the property, and keep an accurate record of repair expenditures;
 
 
 154
 (c) prepare an inventory of damaged personal property showing in detail, quantity, description, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;
 
 
 155
 (d) exhibit the remains of the damaged property as often as may be reasonably required by the Company and submit to examination under oath;
 
 
 156
 (e) submit to the Company within 60 days after requested a signed, sworn statement of loss that sets forth to the best of the named insured's knowledge and belief:
 
 
 157
 (1) the time and cause of loss;
 
 
 158
 (2) interest of the insured and all others in the property involved and all encumbrances on the property;
 
 
 159
 (3) other policies of insurance that may cover the loss;
 
 
 160
 (4) changes in title or occupancy of the property during the term of the policy;
 
 
 161
 (5) specifications of any damaged building and detailed estimates for repair of the damage;
 
 
 162
 (6) an inventory of damaged personal property described in (c) above;
 
 
 163
 (f) give notice of such loss to the proper police authority if loss is due to a violation of law."
 
 
 164
 Due to the nature and circumstances of your loss you are required pursuant to the above policy provision to appear at the office of Donald Bell, Court Reporter, Room 386 in the Manatee County Court House, Bradenton, Florida, at 9:30 A.M. on March 26, 1980, for the purpose of the taking of your statement under oath in reference to the sworn proof of loss submitted by your company.
 
 
 165
 Please be advised that a Court Reporter will be present for the purpose of recording your testimony and the examination under oath could last from three to five hours.
 
 
 166
 Pursuant to the terms and conditions of your policy, and for the reasons that my client's investigation gives it reason to believe that the fire was intentionally set by someone, and in order to property [sic] evaluate the merits of your claim and the amount of your loss, you are requested to bring with you and produce the following documents in support of your claim:
 
 
 167
 1. The subject insurance policy.
 
 
 168
 2. Any written lease agreements involving the leased property or the property which is the subject of the insurance policy.
 
 
 169
 3. All written agreements, contracts, assignments or other documents reflecting the interest of persons other than yourself in the business, equipment or property of the business known as Lord & Lady Restaurant.
 
 
 170
 4. All mortgages, liens or other encumbrances on the subject property or upon any other property you may own or have an interest in.
 
 
 171
 5. All estimates or proposals for repair or rebuilding the leasehold interest and/or your equipment therein.
 
 
 172
 6. Your corporate income tax returns for the years 1979, 1978 and 1977.
 
 
 173
 7. All corporate sales tax returns for the years 1979, 1978 and 1977.
 
 
 174
 8. All employer's quarterly federal tax returns for the years 1979, 1978 and 1977.
 
 
 175
 9. All employer's quarterly state tax and wage reports for the years 1979, 1978 and 1977. (Bureau of Unemployment Compensation)
 
 
 176
 10. All intangible personal property tax returns for the years 1979, 1978 and 1977.
 
 
 177
 11. Your personal income tax returns for the years 1979, 1978 and 1977.
 
 
 178
 12. All banking records for T.D.S. Inc. d/b/a Lord & Lady Restaurant including but not limited to all monthly bank statements, cancelled checks, deposit slips and all work and financial records kept on behalf of T.D.S. Inc. d/b/a Lord & Lady Restaurant for the years 1978, 1979 and 1980 to the present.
 
 
 179
 13. Copies of all monthly bank statements, cancelled checks and all work and financial records kept by you in your behalf for the years 1979, 1978 and 1977.
 
 
 180
 14. Any and all books of account or ledgers kept on behalf of any other business which you were an owner, part owner or partner for the years 1977, 1978 and 1979, plus copies of monthly bank statements, cancelled checks, tax returns filed for the years 1977, 1978 and 1979 in behalf of these other businesses.
 
 
 181
 15. If employed, your withholding statements or check stubs which reflect your income and withholding deductions.
 
 
 182
 16. All phtographs [sic] of the subject property, contents or other property which is the subject of your claim which you may have in your possession, taken both before or after the fire.
 
 
 183
 17. Copies of all other insurance policies covering any property which is the subject of this loss or claim, and if such policy is not available, then such information with respect to these policies, including the name of the insurer and the amount and nature of the coverage.
 
 
 184
 18. All bills, receipts and related documents that substantiate your claim for inventory loss.
 
 
 185
 19. All bills, receipts and related documents that substantiate your claim for repair expenditures or loss to the leasehold premises.
 
 
 186
 20. Copies of all applications for loans, financial statements or other statements of net worth for the last three years.
 
 
 187
 21. Any and all other documents of any kind which you may have or which you can obtain to verify the claim which you have filed for this loss, including, but not limited to, cancelled checks, sales receipts, bills of sale, credit card records, or other documents reflecting purchase of the individual items of personal property set forth in the inventory submitted by you.
 
 
 188
 Please be advised that it is important to keep this meeting as scheduled and that you produce the documents and records requested. If the originals of any requested documents are lost, you are requested to provide copies of such documents which are available and which can be obtained and the expense of any necessary copying will be borne by Shelby Mutual Insurance Company.
 
 
 189
 I have also been instructed to inform you that the sworn statement in proof of loss submitted by you is deficient and fails to comply with the terms and conditions of the subject policy in that you have failed to comply with paragraph 9. (c) and 9. (e)(6) as set forth above.
 
 
 190
 In order to cure this deficiency as well as to enable my client to consider your claim and to expeditiously conduct the statement under oath please resubmit your inventory showing in detail, quantity, description, actual cash value and amount of loss for each item. Please submit with the inventory all bills, receipts and related documents to substantiate the figures in your inventory list.
 
 
 191
 Please be sure that the inventory is submitted prior to the date your statement under oath is scheduled so that I may have an opportunity to review these and thus possibly eliminate unnecessary questioning during your statement under oath.
 
 
 192
 I might further point out that your equipment list is dated as of "June 18, 1979" and your amended inventory should reflect the inventory which you claim was destroyed or damaged as of the date of the fire.
 
 
 193
 Please also submit for statement under oath at the above time and place Dorothy M. Starr, who I understand was an officer or employee of the subject corporation.
 
 
 194
 If the above time and place for the taking of your statement under oath is inconvenient please feel free to contact me and I will be happy to reschedule the same for a time and place convenient for everyone. You are cordially invited to have your attorney or other representative present.
 
 Exhibit B
 THIRD AMENDED COMPLAINT
 
 195
 Now comes the plaintiff by its attorneys, John W. Berry and William Dickey and files this third amended complaint for compensatory, consequential and punitive damages. This complaint is filed in accordance with an order of the court, the pretrial conference, and the Federal Rules of Civil Procedure.
 
 
 196
 Count I.
 
 
 197
 This count seeks compensatory and consequential damages for the plaintiff T.D.S. Incorporated for wilful breach of an insurance contract.
 
 
 198
 1. That this claim is for damages in excess of ten thousand dollars exclusive of costs, interest, and attorney fees.
 
 
 199
 2. That the plaintiff corporation, T.D.S. Incorporated, is a legal resident and citizen of the State of Florida.
 
 
 200
 3. That the defendant corporation, Shelby Mutual Insurance Company, is a legal resident of the State of Ohio and at all pertinent times to this complaint was licensed to do business and was conducting business in Manatee County, Florida.
 
 
 201
 4. That in July of 1979, the defendant insurance company issued a policy of insurance to the plaintiff corporation, a copy of which is attached to the original complaint and is incorporated herein by reference.
 
 
 202
 5. That the policy of insurance issued by the defendant to the plaintiff corporation made T.D.S. a shareholder of the defendant insurance company and entitled the plaintiff corporation to all the benefits and rights of a corporate shareholder.
 
 
 203
 6. That by the terms of the insurance contract issued to the plaintiff corporation, the defendant agreed to indemnify the plaintiff corporation in an amount of approximately One Hundred Thousand Dollars in the event of loss due to fire.
 
 
 204
 7. That the business property insured under the contract of insurance was destroyed by a fire of unknown origin on January 13, 1980.
 
 
 205
 8. That the plaintiff corporation complied with all the conditions of the contract of insurance requisite to the promised indemnity.
 
 
 206
 9. That the defendant insurance company wilfully breached the insurance contract by a wrongful refusal to to [sic] indemnify the plaintiff corporation.
 
 
 207
 10. That the breach of the insurance contract by the defendant was wilful, overtly dishonest and grossly indifferent to the rights of the insured.
 
 
 208
 11. That from the date of the fire loss to the present, the insurance company has caused serious injury to the insured by engaging in the following dishonest, tortious and reckless conduct.
 
 
 209
 (a) By making malicious and false representations on which the plaintiff corporation relied to its detriment.
 
 
 210
 (b) By an unjustified and prejudicial delay in notifying the insured of the defendant's intent to accuse the insured of arson, fraud and false swearing.
 
 
 211
 (c) By fraudulent concealment of evidence relevant to the actual cause and origin of the fire and to the plaintiff's right to recover damages for an uninsured loss.
 
 
 212
 (d) By recklessly exposing the insured to litigation filed by companies entitled to insurance proceeds under the terms of the insurance contract.
 
 
 213
 (e) By fabricating evidence and distorting the facts to create a technical defense to the plaintiff's insurance claim in order to unlawfully cause the plaintiff to abandon its claim or to accept a settlement favorable to the defendant.
 
 
 214
 (f) By falsely representing to the insured that the defendant was cooperating with it in an honest effort to determine the cause and origin of the fire when in fact the defendant was manipulating the insured in an effort to prove a reckless and false presumption of guilt.
 
 
 215
 (g) By a dishonest and reckless inquiry into the cause and origin of the fire while dishonestly assuring the plaintiff that an investigtion [sic] was being conducted.
 
 
 216
 (h) By dishonestly inducing the plaintiff to spend time and money in an alleged cooperative effort to find the cause and origin of the fire all the while the defendant intended to deny the claim and force the plaintiff to abandon its rights or to face the humiliation and expense of a lawsuit.
 
 
 217
 (i) By reckless and wilful publication of slanderous and libelous statements about the sole owners and officers of the plaintiff corporation that defamed the credit and business reputation of the plaintiff.
 
 
 218
 12. That the wilful breach of contract and tortious misconduct resulted in forseeable [sic] consequential damages including the following:
 
 
 219
 (a) Loss of a valuable option to purchase the building.
 
 
 220
 (b) Loss of a business and credit reputation.
 
 
 221
 (c) Cost of an investigation into the cause of the fire.
 
 
 222
 (d) Loss of a right to recovery for the underinsured loss.
 
 
 223
 (e) Loss of a valuable business opportunity.
 
 
 224
 (f) Cost of an attorney to file a lawsuit.
 
 
 225
 (g) Interest paid to the mortgagee.
 
 
 226
 (h) Litigation expenses for third party lawsuits.
 
 
 227
 (i) Loss of use of insurance indemnity funds.
 
 
 228
 12. [sic] That the enumerated damages were the direct and proximate cause of the defendant's wilful breach of the insurance contract and the described malicious, fraudulent and wilful misconduct.
 
 
 229
 13. That by making payments under the policy after declaring it void for fraud and arson, the insurance company waived the defenses of arson, fraud and false swearing, or in the alternative is estopped from asserting those defenses.
 
 
 230
 14. That after the defendant formally denied the insurance claim of the plaintiff, the defendant recognized [sic] the validity of the insurance contract and thereby is estopped from defending the contract claim for damages filed by the plaintiff.
 
 
 231
 15. That the insurance company engaged in unfair and deceptive insurance practices in violation of Florida Statutes Annotated, 626.9541 in the following respects:
 
 
 232
 (a) Before denying the insured's claim, the defendant refused and failed to conduct an investigation based on all reasonably available information.
 
 
 233
 (b) The defendant failed to acknowledge and act promply [sic] upon communications with respect to the plaintiff's claim.
 
 
 234
 (c) The defendant misrepresented pertinent facts relating to the coverage at issue and failed to promptly provide a reasonable explanation in writing to the insured of the reason for denial of its insurance claim.
 
 
 235
 16. That the knowing and wilful violation of the Unfair Insurance Trade Practices Act manifested a gross indifference to the rights of the insured and amounted to an act of legal fraud, independent of the contract of insurance.
 
 
 236
 17. That the knowing and wilful violation of the Unfair Insurance Trade Practices Act estops the insurance company from defending on the basis of arson, fraud false swearing.
 
 
 237
 WHEREFORE, the plaintiff corporation prays for an award of compensatory and consequential damages in an amount determined by the evidence and for an award of costs, interest and statutory attorney fees.
 
 Count II
 
 238
 This count seeks an award of punitive damages on behalf of the plaintiff corporation for bad faith conduct of the defendant insurance company. In support of this count the plaintiff submits the following:
 
 
 239
 19. That the first eighteen paragraphs of this complaint are realleged and incorporated by reference in support of a claim for punitive damages.
 
 
 240
 20. That the defendant insurance company wilfully engaged in tortious misconduct toward the plaintiff corporation with said conduct independent of the knowing breach of contract:
 
 
 241
 (a) With knowledge of the lease terms allowing the plaintiff corporation to purchase the property on which its business was located, the insurance company wilfully, knowingly and dishonestly refused to conduct an honest investigation into the cause and origin of the loss with said refusal resulting in the tortious interference with valuable property rights of the plaintiff.
 
 
 242
 (b) With the premeditated intention to gather only information supporting a reckless and false assumption that owners of the plaintiff corporation had commited [sic] arson and fraud, the insurance company fraudulently assured the plaintiff and its attorney that a routine investigation of the fire loss was being conducted; that the insured would be notified if anything other than the value of the loss was concerned; and that the cooperation of the plaintiff was essential to learning the material facts about the cause and origin of the fire. The fraudulent representations were relied on by the plaintiff corporation and deprived it of the opportunity to conduct a timely investigation to determine responsibility for the excess loss the plaintiff had suffered.
 
 
 243
 (c) With a premeditated intent to prove the plaintiff's owners were responsible for arson, the defendant insurance company conducted a reckless fire scene investigation; willfully ignored compelling evidence that someone other than the plaintiff's owners had caused the fire; and suppressed information important to the rights of the plaintiff corporation to seek recovery from the wrongdoer.
 
 
 244
 (d) With reckless indifference to the truth, the defendant insurance company published reports that the corporate owners had caused the fire loss, were engaged in an insurance fraud, and had falsely testified during an examination under oath.
 
 
 245
 (e) That the published reports amounted to libel and slander per-se of the plaintiff corporation; and that the libel and slander of the corporation was malicious and unprivileged; or in the alternative any alleged privilege was abused and lost through continuing reckless and dishonest conduct of the insurance company.
 
 
 246
 (f) The insurance company falsely assured the insured that it could maintain confidence in the statments [sic] and conduct of the insurance company during the alleged investigation and thereby the defendant created a fiduciary relationship that was fraudulently breached to the injury of the insured. The false representations of the defendant included those listed above and the following:
 
 
 247
 (a) False assertions that the insurance company was acting objectively and fairly in its inquiries.
 
 
 248
 (b) False assertions that the insurance company did not have any reason to believe the plaintiff was responsible for the fire.
 
 
 249
 (c) False assertions that the delay in a decision was due to a need to complete a thorough and difficult investigation with the assistance of the insured.
 
 
 250
 21. That the terms of the insurance contract created a fiduciary relationship that was fraudulently breached by the defendant insurance company.
 
 
 251
 22. That the insurance company fraudulently conveyed misleading information to the insured while knowingly concealing the defendant's true intent and design with regard to denial, with said conduct prejudicial to the plaintiff corporation's rights to protect its interest under the insurance contract.
 
 
 252
 23. That the tortious misconduct of the defendant has continued to the present and has needlessly and maliciously aggravated the injury of the plaintiff. The continuing misconduct includes the following:
 
 
 253
 (a) The defendant's wilful and dishonest refusal to reevaluate the insurance claim of the plaintiff in face of credible and irrefutable direct and circumstantial evidence of the innocence of the corporation.
 
 
 254
 (b) The defendant's filing of an affidavit it knew or should have known was false in a dishonest effort to support a motion for dismissal of punitive damages.
 
 
 255
 (c) The defendant's express or implied permission to an agent of the insurance company to knowingly testify falsely during a deposition.
 
 
 256
 (d) The defendant's malicious and dishonest attempt to coverup the reckless and dishonest conduct of its agents and employees.
 
 
 257
 (e) The defendant's dishonest representation to the court that the company relied on testimony and affidavits that the company knew or had reason to know were false and malicious.
 
 
 258
 (f) The defendant's providing sworn interrogatory replies that were recklessly indifferent to the truth.
 
 
 259
 24. That through the continuing tortious misconduct the defendant has ratified the malicious and dishonest conduct occurring before June 18, 1980, and is estopped from defending on the basis of alleged initial good faith conduct.
 
 
 260
 WHEREFORE, the plaintiff seeks recovery of an award of punitive damages in an amount that will fairly punish the defendant and deter others from similar conduct.
 
 Exhibit C
 THE COURT'S CHARGE TO THE JURY
 
 261
 [The court's preliminary and concluding instructions, which are not relevant to any of the issues presented in this appeal are excluded. What follows are the court's instructions on the liability and damages issues. The paragraphs are numbered for ease of reference.]
 
 
 262
 1. The plaintiff's first claim is asserted under an insurance policy issued by the defendant to the plaintiff which insured the business personal property of the plaintiff and the plaintiff's improvements and betterments in a portion of the building known as 5704 Manatee Avenue, Bradenton, Florida, against loss by fire, with a limit of liability of one hundred thousand dollars. The plaintiff contends that about one-thirty a.m., January 13, 1980, a fire occurred at said premises which damaged or destroyed the business personal property and leasehold improvements of the plaintiff at such location.
 
 
 263
 2. In order to prevail on its claim under the insurance policy, the plaintiff must establish by a preponderance of the evidence that the interest of the plaintiff in the business personal property and lease-hold improvements allegedly damaged or destroyed by fire.
 
 
 264
 3. If a preponderance of the evidence does not support the plaintiff's claim asserted under the insurance policy, then your verdict should be for the defendant. If, however, a preponderance of the evidence does support the plaintiff's claim, you will then consider the defenses raised by the defendant.
 
 
 265
 4. The defendant admits the issuance of the aforementioned insurance policy, but denies that the defendant was or is liable to the plaintiff thereunder, and, in addition, the defendant asserts two separate and alternative affirmative defenses to the plaintiff's first claim.
 
 
 266
 5. For its first affirmative defense, the defendant contends that the plaintiff, by and through its officers, agents or employees, by itself or in concert with others, caused the insured property to be burned, or procured others to cause the insured property to be burned for the purpose of collecting the insurance proceeds under the policy of insurance, and that such conduct on the part of the plaintiff bars any recovery by the plaintiff from the defendant.
 
 
 267
 6. The defendant's first affirmative defense may be established by circumstantial evidence.
 
 
 268
 ....
 
 
 269
 7. Where sufficient motive and opportunity of an insured to burn or to cause or procure the burning of insured property are combined with proof of an incendiary cause of fire, the defense of such intentional burning is supportable by inference.
 
 
 270
 8. The burden of proving its first affirmative defense, by a preponderance of the evidence, is upon the defendant, which must establish that (a) the fire was of incendiary origin or was a set fire, (b) the plaintiff, by its officers, employees or agents, had the opportunity to burn or to cause or to procure the burning of the insured property, and (c) the plaintiff, by its officers, employees or agents, had a motive for burning the insured property.
 
 
 271
 9. An intentional burning of the insured property by the plaintiff's officers, employees or agents, or procured by the plaintiff by its officers, employees or agents, is sufficient to defeat the claim of the plaintiff. While the burden of proof is upon the defendant to establish that the plaintiff intentionally burned or caused or procured the burning of the insured property, nevertheless you are instructed that this fact does not need to be established beyond a reasonable doubt, that it is sufficient that it be established by the greater weight of the evidence.
 
 
 272
 10. The intentional act of the plaintiff in burning or causing or procuring the burning of the insured property is provable by circumstantial evidence, that is, by inference reasonably deductible from facts proven, and this is so because the law recognizes the intrinsic difficulty of establishing that such burning or causing or procuring the burning by direct evidence, as a person who sets a fire to a building usually plans and executes his plan with stealth and secrecy. Consequently, all of the circumstances, preceding and surrounding the origin of the fire on January 13, 1980, as well as the aftermath to the fire should be considered by you.
 
 
 273
 11. In order to establish that the fire of January 13, 1980, was a set fire, the defendant is not required to establish the exact method by which the fire stated [sic].
 
 
 274
 12. In determining whether or not a fire is incendiary, you may consider such factors as multiple points of origin, the pattern of the burn, the nature and the course of the spread of the fire, rapidity of the spread of the fire, and the testimony of experts.
 
 
 275
 13. If you find that a preponderance of the evidence supports the defendant's first affirmative defense, then your verdict should be for the defendant with respect to that defense. If however, a preponderance of the evidence does not support the defendant's first affirmative defense, then your verdict should be in favor of the plaintiff with respect to that defense.
 
 
 276
 14. You then should consider the defendant's second affirmative defense, wherein the defendant contends that the policy of insurance was rendered void by the plaintiff's intentional concealments and misrepresentations of material facts relating to the insurance, which were made by officers, servants or agents of the plaintiff to employees or agents of the defendant (a) during the court [sic] of the latters' investigation of the fire, (b) in the submission by the plaintiff to the defendant of a proof of loss and inventory, and (c) during the examinations under oath of Mr. Thomas Starr and/or Mrs. Dorothy Starr.
 
 
 277
 15. The insurance policy, which is the subject of this action, contains the following provisions on page one of Form MP-4 with respect to concealment or fraud:
 
 
 278
 "Concealment or Fraud. This policy is void if any insured has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance."
 
 
 279
 16. If you find that a preponderance of the evidence supports the defendant's second affirmative defense, that the insurance policy is void because the plaintiff intentionally concealed or misrepresented any material fact or circumstance relating to the insurance, then your verdict should be for the defendant with respect to that defense. If, however, a preponderance of the evidence does not support the defendant's second affirmative defense, then your verdict should be in favor of the plaintiff with respect to that defense.
 
 
 280
 17. The defendant filed a counterclaim against the plaintiff, wherein the defendant seeks to recover from the plaintiff the sum of one hundred twenty-five thousand dollars, which the defendant alleges it was required to pay to another of its insureds, Eugene R. Cohenour, under a policy of insurance issued by the defendant which covered the building owned by Mr. Cohenour which the plaintiff, through its officers, agents or employees, acting by itself or in concert with others, burned or caused to be burned, or procured others to cause the insured property to be burned for the purpose of collecting the insurance proceeds under the plaintiff's own policy of insurance issued by the defendant, which policy covered the plaintiff's business personal property and leasehold improvements.
 
 
 281
 18. So, in order to prevail on its counterclaim, the defendant must establish by a preponderance of the evidence, the following elements:
 
 
 282
 19. One, that on or about January 13, 1980, the plaintiff, through its officers, agents or employees, acting by itself or in concert with others, caused the insured building to be burned for the purpose of enabling the plaintiff to collect insurance under its own policy of insurance which provided coverage on plaintiff's business personal property and leasehold improvements.
 
 
 283
 20. Two, at the time of the said fire, there was in force and effect an insurance policy issued by the defendant to Eugene R. Cohenour, which provided insurance coverage in the amount of one hundred twenty-five thousand dollars on a building owned by the latter.
 
 
 284
 21. Three, by reason of the fire, the defendant was required to pay, and paid, to the said Eugene R. Cohenour, the sum of one hundred twenty-five thousand dollars, and thereby became subrogated to a claim in said amount against the plaintiff.
 
 
 285
 22. If a preponderance of the evidence does not support the defendant's counterclaim against the plaintiff, then your verdict should be for the plaintiff on such counterclaim. If, however, a preponderance of the evidence does support the defendant's counterclaim, you will then consider the defenses raised by the plaintiff to such counterclaim.
 
 
 286
 23. The plaintiff denies the contentions of the defendant set forth in the said counterclaim, and, in addition, has asserted certain affirmative defenses to the counterclaim, including a defense of estoppel and a defense of waiver.
 
 
 287
 24. If a preponderance of the evidence does not support the plaintiff's defenses to the defendant's counterclaim, then your verdict should be for the defendant with respect to each of the plaintiff's defenses which is not supported by a preponderance of the evidence. If, however, you find that any of the plaintiff's defenses to the defendant's counterclaim are supported by a preponderance of the evidence, then your verdict should be for the plaintiff with respect to those defenses established by a preponderance of the evidence.
 
 
 288
 25. The second claim of the plaintiff against the defendant is that the defendant breached the policy of insurance by not paying the plaintiff's claim thereunder, and that the defendant's conduct amounted to deliberate, overt and dishonest dealings entitling the plaintiff to punitive damages.
 
 
 289
 26. So, in order to prevail on its second claim, the plaintiff must establish each of the following elements by a preponderance of the evidence:
 
 
 290
 27. One, that the defendant breached the insurance policy which it issued to the plaintiff by not paying to the plaintiff the amount owed the plaintiff under the policy.
 
 
 291
 28. Two, that the defendant's conduct in refusing to pay the plaintiff's claim amounted to deliberate, overt and dishonest dealings.
 
 
 292
 29. The insurance policy between the plaintiff and the defendant did not create a fiduciary relationship between the plaintiff and defendant. Instead it created an adversarial relationship, like that of a debtor and a creditor.
 
 
 293
 30. In general, punitive damages may not be awarded in cases based upon breach of a contract. For punitive damages to be recoverable in a suit on a fire insurance policy, the insurer must not only have refused to pay the insured's claim, the insurance company must also be guilty of deliberate, overt and dishonest dealings with respect to such claim.
 
 
 294
 31. An employer is liable for the negligence or misconduct of its own employees done within the performance of the duty or work of the employer. This is because it is presumed that the employer retained authority and control of the manner, means and method by which the work is to be performed. However, no such liability exists where the employer merely engages another in an independent contractor to do particular work, but retains no right or power to, and does not, direct or control the manner, means or method by which the result is to be accomplished.
 
 
 295
 32. If you find from a preponderance of the evidence that the defendant employed M. J. Haskins and Associates, an insurance adjusting firm, Equifax Services, Inc., a firm engaged, among other things, in performing investigations to determine the cause and origin of fires, and Richard Wilson, an attorney experienced in representing insurance companies in investigating and handling insurance claims in cases suspected of involving intentional burning of insured property, to investigate and represent the defendant in ascertaining the cause and origin of the fire of January 13, 1980, at the Lord and Lady Restaurant, which fire allegedly damaged or destroyed certain business personal property and leasehold improvements of the plaintiff, but that the defendant reserved no right to interfere with the details of the work of those parties but only to require such work to be done by such parties and their respective employees, then you should find that such parties so employed by the defendant were independent contractors, and that the defendant is not liable for any negligence or misconduct of such parties, or their employees, in the performance of their respective tasks, unless defendant directed or controlled the manner, means or method by which the result is to be accomplished.
 
 
 296
 33. If a preponderance of the evidence does not support the second claim of the plaintiff, then your verdict with respect thereto should be in favor of the defendant. If, however, a preponderance of the evidence does support the plaintiff's claim, you will then consider the defenses raised by the defendant to such second claim.
 
 
 297
 34. Similar to the response made by the defendant to the plaintiff's first claim, the defendant denies that it is liable to the plaintiff, and, alternatively, the plaintiff asserted the two affirmative defenses which the defendant asserted to the plaintiff's first claim. One of those defenses was that the plaintiff, by its officers, servants or agents, burned or caused or procured the burning of the plaintiff's business personal property and leasehold improvements to collect the insurance proceeds claimed due under the insurance policy issued by the defendant to the plaintiff. The second affirmative defense asserted by the defendant contended that the policy of insurance was rendered void by the plaintiff's willful concealments and misrepresentations of material facts relating to the insurance which were made (a) by representatives of the plaintiff, to representatives of the defendant during the course of the latter's investigation, (b) the submission by the plaintiff to the defendant of a proof of loss and inventory, and (c) during the defendant's examination under oath of Mr. and Mrs. Starr, the sole stockholders, officers and directors of the plaintiff.
 
 
 298
 35. The instructions which I gave to you personally concerning the burden of proof with respect to the affirmative defenses to the first claim are also applicable with respect to such defenses as they are asserted to the plaintiff's second claim. If a preponderance of the evidence supports either or both of such affirmative defenses, then your verdict should be in favor of the defendant with respect to the plaintiff's second claim. If, however, a preponderance of the evidence does not support the defendant's affirmative defenses to the second claim, then your verdict should be for the plaintiff with respect to the latter's second claim.
 
 
 299
 36. You should not consider the issue of the plaintiff's damages, unless you find from a preponderance of the evidence that the plaintiff has established one or both of its claims. You are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as reasonable compensation for all of the plaintiff's damages, no more and no less.
 
 
 300
 37. With respect to the plaintiff's claim for compensatory damages for breach of the insurance contract, that is, failure to pay the amount due under the contract, which has a limit of liability of one hundred thousand dollars.
 
 
 301
 38. The insurance policy expressly provides certain bases for establishing the valuation of property. With respect to business personal property and the plaintiff's leasehold improvements, the policy provides for valuation of such property at the actual cash value thereof at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like quality within a reasonable time after such loss, nor in any event for more than the interest of the named insured.
 
 
 302
 39. Thus, if you find that the plaintiff is entitled to recover, then you should determine, from a preponderance of the evidence, the actual cash value, if any, of such business personal property and leasehold improvements as of the time of the loss, January 13, 1980, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss. Also, in no event is the plaintiff entitled to recover for more than the plaintiff's interest in such insured business personal property and leasehold improvements. Further, under no circumstances is the plaintiff entitled to recover compensatory damages in excess of one hundred thousand dollars, which is the limit of coverage provided by the policy.
 
 
 303
 40. In connection with its first claim, the plaintiff seeks to recover consequential or special damages arising out of the failure of the defendant to pay any amounts due under the insurance policy. In order to recover consequential or special damages, the plaintiff must prove, by a preponderance of the evidence, the special circumstances under which the insurance policy was entered into which were known to both parties, the damages which they should reasonably contemplate as the reasonable and natural consequences of the breach or the measure of the damages which would ordinarily follow from a breach of the contract under such special circumstances.
 
 
 304
 41. To charge the defendant with special circumstances, the plaintiff must establish by a preponderance of the evidence and at the time the insurance policy was entered into or prior thereto, the defendant had reasonable notice or knowledge of the special circumstances rendering such damages the natural and probable result of such breach. Otherwise, it cannot be said that such peculiar circumstances were contemplated by the defendant, and the damages recoverable by the plaintiff will be limited to those resulting from the ordinary and obvious purpose of the contract and which naturally and necessarily, in the usual course of things, flow from its breach.
 
 
 305
 42. As a general rule, in measuring the damages for the breach of a contract, those recoverable are limited to such as resulting from a breach of the contract sued on, and losses arising from collateral transactions or contracts, although affected by the breach of the contract on which the suit for damages is based, cannot be covered. Where, however, at the time of entering into a contract a party knows of special circumstances from which it might reasonably be foreseen by him, that his failure to perform will in turn result in a breach by the other party of a collateral agreement made by him with a third person, and both agreements are in fact breached, the party breaching the original contract is liable to the other party for losses sustained as a result of the latter's inability to perform the collateral agreement.
 
 
 306
 43. In this case plaintiff's claim against the defendant is based upon certain allegedly false and fraudulent misrepresentations made by the defendant to the plaintiff.
 
 
 307
 44. The term "fraud" is generally defined in the law as an intentional misrepresentation of material existing fact made by one party to another with knowledge of its falsity and to induce the other party to act, and upon which the other party reasonably relies with resulting injury or damages.
 
 
 308
 45. In this instance the alleged misrepresentations upon which plaintiff's claims are based are asserted to be as follows:
 
 
 309
 46. One, that the insurance company falsely ly represented that it was conducting an investigation into the cause and origin of the fire.
 
 
 310
 47. Two, that the insurance company falsely represented to the plaintiff th it would share in investigative information or reports with it on the cause and origin of the fire loss.
 
 
 311
 48. Three, that the insurance company falsely represented that it had no information on reports implicating the corporation in arson.
 
 
 312
 49. Four, that the defendant falsely represented that it would confront the insured with any alleged evidence in its involvement of arson and fraud.
 
 
 313
 50. The essential elements that plaintiff must prove by a preponderance of the evidence to establish a claim for fraudulent misrepresentation are as follows:
 
 
 314
 51. First, a misrepresentation by the defendant to the plaintiff of a "material existing fact." Thus, the alleged misrepresentation must be false, and it must be material in the sense that it relates to a matter of some importance or significance as opposed to a minor or trivial detail. It must also relate to an existing fact. Ordinarily, a promise to do something in the future cannot be the basis of a claim for fraud unless the promisor made the promise without a present intent to perform it, or with a positive intent not to perform it. Similarly, the mere expression of an opinion does not constitute a basis for a claim of fraud unless the party making such statement has exclusive or superior knowledge of facts inconsistent with such statement.
 
 
 315
 52. Second, plaintiff must prove that the defendant knew or reasonably should have known of the falsity of the misrepresentation at the time it was made; or that it was made in negligent disregard for its truth or falsity.
 
 
 316
 53. Third, the plaintiff must prove that the defendant intended to induce the plaintiff to rely and act upon the misrepresentation. To do something intentionally is to do it knowingly and voluntarily, and not because of accident or mistake. Such intent may be determined from the facts and circumstances surrounding the case.
 
 
 317
 54. Fourth, the plaintiff must prove that he justifiably relied and acted upon the misrepresentations. If, in the exercise of reasonable care for the protection of his own interests, the plaintiff could have ascertained the truth of the matter by making a reasonably [sic] inquiry or investigation under the circumstances presented, but failed to do so, then it cannot be said that he "justifiably" relied upon such misrepresentations.
 
 
 318
 55. Fifth, and last, the plaintiff must prove that he suffered injury or damage as a proximate result of the misrepresentations. For damage to be the proximate result of fraud it must be shown that, except for the fraud, such damage would not have occurred.
 
 
 319
 56. Each of the misrepresentations that plaintiff alleges to have been made by the defendant must be separately judged according to each of these essential elements.
 
 
 320
 57. Now, if you find that the plaintiff has failed to prove his claim of fraud under these instructions, then, of course, your verdict will be for the defendant.
 
 
 321
 58. Plaintiff claims the following item of special damages: Loss of a valuable business opportunity and loss of a business and credit reputation.
 
 
 322
 59. It is the burden of the plaintiff to establish any special damages it has sustained by a preponderance of the evidence. If a preponderance of the evidence does not support the plaintiff's claim of special or consequential damages, then your verdict on that issue should be for the defendant. If, however, a preponderance of the evidence does support the claim of the plaintiff with respect to such damages, then your verdict should be for the plaintiff for the amount in dollars of special or consequential damages which you find the plaintiff has established by a preponderance of the evidence.
 
 
 323
 60. If you find from a preponderance of the evidence that the defendant is entitled to recover from the plaintiff on the defendant's counterclaim against the plaintiff, then you should consider the defendant's damages.
 
 
 324
 61. It is the burden of the defendant to establish, by a preponderance of the evidence, the amount of dollars which the defendant was required to pay to Eugene Cohenour under the insurance policy issued by the defendant to him, as a result of the acts of the plaintiff, by its officers, employees and agents, in burning or causing or procuring the burning of the insured building for the purpose of enabling the plaintiff to recover from the defendant under the policy issued by the defendant to the plaintiff with respect to the business personal property and leasehold improvements of the plaintiff.
 
 
 325
 62. With respect to the plaintiff's second claim, the plaintiff is seeking punitive damages. If you find from a preponderance of the evidence that the plaintiff is entitled to punitive damages in addition to compensatory and consequential or special damages, then you should consider the following.
 
 
 326
 63. If you further find that the defendant's conduct amounted to deliberate, overt and dishonest dealings, the law would allow you, in your discretion, to assess punitive damages against the defendant as punishment and as a deterrent to others.
 
 
 327
 64. If you find that punitive damages should be assessed against the defendant, you may consider the financial resources of the defendant in fixing the amount of such damages.
 
 
 328
 [The court concluded its charge to the jury by submitting the following special interrogatories, which the court gave to the jury in written form. The jury's answer to each interrogatory is indicated parenthetically.]
 
 
 329
 Special interrogatories to the jury.
 
 
 330
 66. "One, do you find from a preponderance of the evidence that the plaintiff had an interest on January 13, 1980, in the following properties situated at 5704 West Manatee, Bradenton, Florida: (a) Business personal property. Answer yes or no." There is a blank space, fill in whichever answer you pick. [The jury answered, yes.]
 
 
 331
 67. "(B) Leasehold improvements. Answer yes or no." You pick whichever answer you choose and fill in the blank. [The jury answered, yes.]
 
 
 332
 68. Question two: "Do you find from a preponderance of the evidence that the plaintiff corporation, through its officers, agents or employees, intentionally burned or caused or procured the burning of the Lord and Lady Restaurant on January 13, 1980." Answer it yes or no. Select your answer and fill it in the blank space. [The jury answered, no.]
 
 
 333
 69. Three, "Do you find from a preponderance of the evidence that the plaintiff corporation, through its officers, agents or employees made material misrepresentations to, or concealed material facts from the defendant insurance company during the latter's investigation of the aforementioned fire?" Answer yes or no. Select your answer and fill it in the blank space. [The jury answered, no.]
 
 
 334
 "Note: If you answered yes to either questions two or three, you need not consider or answer questions four, five and six. If you answered yes to question two, then you should consider and answer question seven."
 
 
 335
 70. Question number four: "If you answered no to both question two and question three, what sum of money do you find from a preponderance of the evidence to be the total amount of damages to the following property of the plaintiff corporation:
 
 
 336
 "(A) For damaged business personal property, answer in dollars." There's a blank space there. [The jury answered, $88,000.]
 
 
 337
 "(B) For damages to leasehold improvements. Answer in dollars." And there's a blank space. [The jury answered, $12,000.]
 
 
 338
 "(C) For any consequential or special damages. Answer in dollars." And there's a blank space. [The jury answered $420,000.]
 
 
 339
 71. Question number five: "Do you find from a preponderance of the of the [sic] evidence that the facts involving the refusal of defendant to pay the plaintiff's claim amounted to deliberate, overt and dishonest dealings?" Answer yes or no. Select the answer and fill it in the space. [The jury answered, yes.]
 
 
 340
 "Note: If your answer to question five was no, do not consider or answer question six. If your answer to question five is yes, then you should consider and answer question six."
 
 
 341
 72. Question number six: "If you answered yes to question number five, what sum of money do you find should be assessed against the defendant as punitive damages? Answer in dollars." And there's a blank space. [The jury answered, $2.1 million.]
 
 
 342
 73. Question number seven: "If your answer to question two was yes, what sum of money do you find from a preponderance of the evidence to be the total amount of the defendant's damages with respect to its counterclaim against plaintiff? Answer in dollars." And there's a blank space.
 
 
 343
 (Emphasis added).
 
 
 
 *
 Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 In addition to the loss of inventory, equipment, supplies, and cash incurred by TDS as a result of the fire, the corporate owner of the beauty salon was paid $26,000.00 for its fire loss by American States Insurance Co. (ASIC). ASIC also paid on a claim submitted by Faye Cohenour, the brother of Eugene, for the destruction of carpet rolls he had stored in the warehouse. Eugene Cohenour was eventually paid $125,000.00, the policy limits, by Shelby for damage to the building; he also received payment from ASIC for damage to furniture he had stored in the warehouse
 
 
 [2]
 At the time of trial Shelby was unable to produce these photographs, some of which probably were of the restaurant's office
 
 
 [3]
 When we refer to a "first party claim", we mean "a suit by an insured against his insurance company because of its failure to settle his claim." Indus. Fire & Casualty Ins. Co. v. Romer, 432 So.2d 66, 69 (Fla.Dist.Ct.App.1983) (Hurley, J., concurring) (emphasis in original), as opposed to a suit based on the insurer's failure to settle a third party tort claim for a reasonable sum. Id
 
 
 [4]
 The jury was instructed that Shelby owed no fiduciary duty towards TDS. They also were told that before punitive damages could be awarded, they must find that Shelby engaged in deliberate, overt and dishonest dealings. Finally, the trial court gave a standard fraud instruction to fulfill the independent tort requirement of Florida law
 
 
 [5]
 In its brief, TDS contends that the district court should have stricken Shelby's defense of arson at the conclusion of the evidence in defense. TDS also argues that Shelby was estopped by its conduct from presenting to the jury its arson defense. Quite apart from the lack of merit in these arguments, the plaintiff has failed to file a cross-appeal from any ruling of the district court. It therefore has failed to preserve any issue for appeal
 
 
 [6]
 The jury was instructed that the following statements comprised TDS's fraud claim:
 One, that the insurance company falsely represented that it was conducting an investigation into the cause and origin of the fire.
 Two, that the insurance company falsely represented to the Plaintiff that it would share in investigative information or reports with it on the cause and origin of the fire loss.
 Three, that the insurance company falsely represented that it had no information or reports implicating the corporation in arson.
 Four, that the Defendant falsely represented that it would confront the insured with any alleged evidence in its involvement of arson and fraud.
 T. 13:320-21.
 
 
 [7]
 TDS contends that this court is without jurisdiction to address the remittitur issue because the motion in the district court was untimely filed. Although the record reflects that a document specifically styled "Verdict for Punitive Damages was Excessive" was filed one day out of time, apparently due to a clerical error, the papers which were timely filed gave the trial judge the opportunity to exercise her discretion concerning a new trial or remittitur on the special and punitive damages awards. See R. 956 & 969. Under these circumstances, we conclude that Shelby has preserved the remittitur issue for appellate review. See Carlton v. H.C. Price Co., 640 F.2d 573, 577 (5th Cir.1981)
 
 
 [8]
 Since this is a diversity case, the issue of whether the jury's verdict is excessive is determined by reference to state substantive law. See Quality Foods, Inc. v. U.S. Fire Ins. Co., 715 F.2d 539, 542 & n. 2 (11th Cir.1983). If the verdict is excessive under state law, federal law then determines whether a new trial should be granted. See id. at 542 n. 2
 
 
 [9]
 The jury answered in the affirmative the following question submitted to it:
 Do you find from a preponderance of the evidence that the facts involving the refusal of the defendant to pay the Plaintiff's claim amounted to deliberate, overt and dishonest dealings?
 R. at 944.
 
 
 [10]
 At the time of trial, Shelby had assets in excess of $200,000,000.00
 
 
 [11]
 Florida follows the general rule that to be recoverable, damages for breach of contract "must arise naturally from the breach, or have been in the contemplation of both parties at the time they made the contract, as the probable result of a breach." Hobbley v. Sears, Roebuck and Co., 450 So.2d 332, 333 (Fla.Dist.Ct.App.1984) (citing Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854)). Moreover, concerning foreseeability, Florida law does not require that the parties have contemplated the precise injuries which occurred; rather, damages are recoverable so long as the actual consequences of breach of the contract could have reasonably been expected to flow from the breach. Natural Kitchen, Inc. v. American Transworld Corp., 449 So.2d 855, 860 (Fla.Dist.Ct.App.1984): see 5 A. Corbin, Corbin on Contracts Sec. 1010, at 79 (1964). Although generally an insurer's liability under an insurance contract will not exceed the contractual limits of liability, the Florida courts have extended the Hadley special damages rule to allow recovery of these damages if they were in the contemplation of the parties at the time of the creation of the insurance contract. See Life Investors Ins. Co. v. Johnson, 422 So.2d 32 (Fla.Dist.Ct.App.1982). Additionally, an insurer exposes itself to liability greater than the policy limits if its conduct also amounts to a separate tort. See MacDonald v. Penn Mutual Life Ins. Co., 276 So.2d 232 (Fla.Dist.Ct.App.1973)
 
 
 [12]
 Since we conclude that a jury question did exist on the fraud claim to special damages, we find it unnecessary to examine Shelby's arguments concerning the permissibility of these damages under a contractual theory
 
 
 [13]
 The lease provided that in the event of a fire, the Starrs were obliged to pay monthly rent to Eugene Cohenour. Mr. Cohenour, however, was required to rebuild and recognize the continued validity of the lease if TDS so desired, and the construction could be accomplished within six months
 
 
 [14]
 In support of the special damage award, TDS contends that "[t]he jury was entitled to believe that all of the hard work and efforts of the Starrs were about to come to fruition." Brief of Appellee at 44. TDS further argues that "[t]he jury was entitled to believe the testimony of growing crowds, a changed atmosphere, honest effort, efficient cost control, and a season in which even inefficient businesses make money in Florida." Id. Be that as it may, the fact remains that TDS is attempting to sustain the award on the basis of lost future profits. Notwithstanding TDS's failure to cross-appeal the district court's refusal to instruct the jury on lost profits, to recover anticipated lost profits in Florida, the plaintiff must show such a loss with reasonable certainty by competent proof. Polyglycoat Corp. v. Hirsch Distribs., Inc., 442 So.2d 958, 959 (Fla.Dist.Ct.App.), petition for review dismissed, 451 So.2d 848 (Fla.1984); Wash-Bowl, Inc. v. Wroton, 432 So.2d 766, 767 (Fla.Dist.Ct.App.1983). To carry this burden, it is incumbent upon the plaintiff to show a history of profitability for a reasonable time anterior to the breach of the contract sued upon. Polyglycoat Corp., 442 So.2d at 959; Wash-Bowl, Inc., 432 So.2d at 767; A & P Bakery Supply & Equip. Co. v. Hawatmeh, 388 So.2d 1071, 1072 (Fla.Dist.Ct.App.1980). It is undisputed that TDS had no history of past profits, and, therefore, any award for loss of future profits would be "too remote, contingent, and speculative to meet the legal standards of reasonable certainty." Polyglycoat Corp., 442 So.2d at 959; Wash-Bowl, Inc., 432 So.2d at 767; A & P, 388 So.2d at 1072
 
 
 [15]
 The district court overruled TDS's motion to add the Starrs as parties-plaintiff. R. at 809-12. No appeal has been taken from that ruling
 
 
 [16]
 Shelby asserts that the value of the restaurant and lounge "would appear to be merely an improper attempt to obtain lost future profits." Initial Brief of Appellant at 38-39. This assertion is belied by recent Florida case law. In Polyglycoat Corp., 442 So.2d 959, the court stated that lost profits may not be recovered by a new business with no history of profits. See supra note 14. The court went on to note, however, that if a new business is completely destroyed as a result of a breach of contract, "the proper total measure of damages is market value on date of loss." Polyglycoat Corp., 442 So.2d at 960. We consider this measure of damages to be appropriate in the facts of this action
 
 
 [17]
 Shelby categorically asserts that "a court would never consolidate a liability case and a typical 'bad faith' claim," citing as authority Boston Old Colony Ins. Co. v. Gutierrez, 386 So.2d 783 (Fla.1980), cert. denied, 450 U.S. 922, 101 S.Ct. 1372, 67 L.Ed.2d 350 (1981). Initial Brief of Appellant at 48 n. 21. Two aspects of that case which distinguish it from the one at bar bear mentioning. First, Gutierrez is an excess judgment case; any claim of bad faith, therefore, necessarily would not even exist in such a case until the insured-tortfeasor was adjudged liable for an amount in excess of the insurance policy limits. Second, the plaintiff in Gutierrez was an injured third party suing the tortfeasor's insurance company for its alleged bad faith in failing to settle the claim against its insured. Gutierrez, therefore, is clearly inapposite
 Shelby also ignores the fact that courts routinely allow tandem contract and first party bad faith claims to be tried together. See e.g., Riverside Ins. Co. v. Pedigo, 430 N.E.2d 796 (Ind.Ct.App.1982); see also Nat'l Sec. Fire & Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984) (court reversed general jury verdict awarding damages for breach of contract, fraud, and bad faith refusal to pay a direct claim since there was a jury question on the contract claim, yet assumed all claims were properly joined and tried). In fact, res judicata principles have been held to require the joinder of a contract and a bad faith refusal to pay claim. For example, in Stone v. Beneficial Standard Life Ins. Co., 273 Or. 594, 542 P.2d 892 (1975) (en banc), the court held that a named beneficiary of a life insurance policy who successfully sued the insurer for the amount of the policy was barred from maintaining a subsequent action against the insurer for its alleged bad faith refusal to pay the initial claim. The court reasoned that:
 [T]he same parties litigated the first action in which Stone recovered the amount of the policy. Stone is now bringing an action against defendant for its alleged bad faith in the breach of the same contract and for alleged actual damages incurred as the result of having to bring the first lawsuit. It is evident that the present action is based on the same set of operative facts as the first action for the relief for which recovery is now sought. (citation omitted).
 Id., 542 P.2d at 894; see also Christian v. Home Ins. Co., 577 P.2d 899 (Okla.1978) (insurer not allowed to rely on prior judgment as bar to bad faith refusal to pay action where insurer is estopped from doing so by its own conduct). It is clear that Shelby's claim that jurisdictions which recognize bad faith refusal to pay claims will not allow the consolidation of the contract and bad faith claims is simply not supported by the case law.
 
 
 [18]
 Arguably, an analogy more appropriate than the malicious prosecution cases can be found in the law of abuse of process. In Blue v. Weinstein, 381 So.2d 308, 311 (Fla.Dist.Ct.App.1980), the court distinguished a malicious prosecution claim from an abuse of process claim, noting that an essential element of the former but not the latter tort is the termination of the action in favor of the plaintiff. The court accordingly held that "[a]n abuse of process claim may henceforth be brought as a counterclaim when directed against process served in the pending main action." Id. at 311-12. We note, however, that the Blue court was mindful of the possible necessity of severing the main claim from the abuse of process counterclaim in the event that a joint trial would unduly complicate the case. See id. at 312 n. 2
 
 
 [19]
 The dissent includes the following statements:
 
 
 [1]
 Starr answered all the questions ... and made no patently incriminating statements. Page 1540
 
 
 [2]
 Mrs. Starr ... [l]ike her husband, she made no patently incriminating statements. Page 1540
 
 
 [3]
 Berry knew that his count two bad faith claim could not withstand scrutiny in the light of Florida precedent and that his prayer for punitive damages might be stricken from the case. Page 1542
 
 
 [4]
 Attorney Berry apparently read the district court's order directing him to replead his case ... as a license to disregard these rules. Page 1543
 
 
 [5]
 During that conference, the court did a complete about-face with respect to the plaintiff's bad faith claim. Page 1546
 
 
 [6]
 Had the district court's bad faith instruction expressed the law of Florida at the time of the fire in this case, Shelby Mutual would have settled this case long before it got to the courthouse. Page 1549
 
 
 [7]
 Shelby would have settled for another reason.... Page 1549
 
 
 [8]
 It also punishes society. In time, the jury verdict here and in the cases that inevitably will follow, especially in the federal district courts in Florida, will be reflected in the fire insurance rates. Page 1550
 
 
 [9]
 The public will bear an additional burden as well: some insurance companies will cease underwriting fire risks and many law-abiding citizens will go without coverage. Page 1550
 
 
 [10]
 Second, Mrs. Starr's testimony that the Lord & Lady was worth $225,000 on the eve of the fire was not worthy of belief. Page 1553
 
 
 [11]
 For example, it could have sold its goodwill, and the name "Lord & Lady," to someone else. Page 1554
 These and other statements criticize the plaintiff's attorney and the trial judge for their handling of the case, weigh the testimony of the witnesses (credibility), predict what the actions of various individuals and Shelby Mutual Insurance Company would have been under other circumstances, forecasts future insurance rates for the citizens of Florida and suggests that many "law-abiding" citizens will be unable to obtain any insurance. Judge Tjoflat's crystal ball is better than mine!
 Most respectfully, such evaluations, innuendos, predictions and baseless assumptions hardly seem appropriate for those of us serving as appellate judges. The jury believed the Starrs. The jury concluded that they were law-abiding citizens (not guilty of arson). The trial judge did the best she could to give the parties a fair trial. No one suggests that any evidence was not received or considered because of time constraints. No one suggests that the trial judge was not totally impartial in her conduct of the trial.
 It does appear that Judge Tjoflat and the majority have a difference of opinion as to whether or not the facts of this case support a claim for the tort of fraud and deceit based upon "deliberate, overt and dishonest dealings" in accordance with Florida law. Smith, 435 So.2d at 849. Reasonable judges often disagree.
 Judge Tjoflat criticizes, at great length, the trial court's charges covering this independent tort and the relationship between the parties. Strangely, counsel do not.
 It is the majority's position that Florida law sets forth this sound proposition. While insurance companies may be in a debtor-creditor relationship with their assureds making a claim, this does not give them the right to lie, to deceive, to make false statements or to engage in deliberate, overt and dishonest dealings to the detriment and damage of the assured. Such hardly seems shocking or contrary to common sense. Nor does the majority feel that such a rule of law will result in any hardship to law-abiding insurance companies.
 
 
 [1]
 Although the insurance policy did not provide explicitly that the insured could not recover for a fire loss it deliberately caused, Florida common law nonetheless provided such a bar. An insured cannot recover for losses caused by his own fraud or misconduct, including arson. Everglades Marina, Inc. v. American Eastern Development Corp., 374 So.2d 517, 519 (Fla.1979); Carter v. Carter, 88 So.2d 153, 157 (Fla.1956). The insurance policy did provide that it would be voided if the insured "intentionally concealed or misrepresented any material fact or circumstance relating to this insurance." Shelby Mutual relied on this Florida common law principle and the quoted policy provision in rejecting T.D.S.' insurance claim, contending that T.D.S. had deliberately caused the fire and then concealed this fact, among others, from Shelby during Shelby's investigation into the origin and cause of the fire and the extent of T.D.S.' personal property loss
 
 
 [2]
 Belfrap, Inc., sold the Lord & Lady's assets, lease and purchase option to T.D.S. and the Starrs for much less than it had invested in those assets. See infra text p. 1554. It did so because the business was losing money
 
 
 [3]
 The insurance policy obligated T.D.S. to
 prepare an inventory of damaged personal property showing in detail, quantity, description, actual cash value and amount of loss [, to] attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory [, and to] submit to [Shelby] within 60 days after requested a signed, sworn statement of loss that sets forth to the best of the named insured's [T.D.S.'] knowledge and belief: (1) the time and cause of loss; (2) interest of the insured and all others in the property involved and all encumbrances on the property; (3) other policies of insurance that may cover the loss; (4) changes in title or occupancy of the property during the term of the policy; (5) specifications of any damaged building and detailed estimates for repair of the damage; (6) an inventory of [the] damaged personal property....
 The insurance policy also gave Shelby the right to "examine and audit [T.D.S.'] books and records at any time during the policy period ... as far as they relate to the [fire insurance coverage]." Finally, the insurance policy provided that it would be "void if [T.D.S.] intentionally concealed or misrepresented any material fact or circumstance relating to [the fire insurance coverage]." See supra note 1. These policy provisions, which collectively obligated T.D.S. to provide Shelby with any information Shelby might request of it concerning the origin and cause of the fire and the extent of T.D.S.' personal property loss, evidenced, in part, the debtor-creditor, adversarial relationship Shelby and T.D.S. occupied at all time pertinent to this case.
 
 
 [4]
 The action was filed in the Florida circuit court but was removed by Shelby to the district court in November 1980
 
 
 [5]
 The Florida Code of Professional Responsibility, Disciplinary Rule 5-102(A), provides that "[i]f, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial...." Disciplinary Rule 5-102(B) provides that if a lawyer "may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client." Cf. Model Code of Professional Responsibility DR 5-101(B) and 5-102(A); Model Rules of Professional Conduct, Rule 1.7 and comment thereto. A lawyer need not withdraw if he will be called as a witness to testify only about uncontested matters. Florida Code of Professional Responsibility, Disciplinary Rule 5-101(B)(1)-(4). It became obvious to Richard Wilson as this case proceeded toward trial that his testimony was to become an integral part of T.D.S.' bad faith claim and Shelby's defense of that claim. (As it turned out, T.D.S. called him to testify in its case in chief.) Consequently, Wilson had an ethical duty, as attorney Berry well knew, to withdraw as Shelby's trial counsel, and he subsequently did so. See infra p. 1542
 
 
 [6]
 Attorney Berry's participation in the case as an expert witness for T.D.S. called into question his continued representation of T.D.S. as trial counsel. See supra note 5
 
 
 [7]
 See supra note 1
 
 
 [8]
 At trial, however, Berry took the opposite position. There, he contended that T.D.S. could prevail on its bad faith claim even though Shelby's arson defense was a jury issue. The district court instructed the jury in accordance with Berry's view of the law, see infra Part II.A.; Appendix, Exhibit C, paragraphs 25-27 and 30, even though it stated in its charge conference that Florida law did not provide a bad faith tort claim in the circumstances of this case. See infra p. 1546
 
 
 [9]
 See supra note 5
 
 
 [10]
 At this point, the trial judge presiding over the case, the Honorable William Terrell Hodges, assigned it to a district judge new to the court's Tampa Division, the Honorable Elizabeth A. Kovachevich. Judge Kovachevich then presided over the case to its conclusion
 
 
 [11]
 Fed.R.Civ.P. 21 provides in pertinent part that: "Parties may be ... added by order of court ... at any stage of the action." (Emphasis added)
 
 
 [12]
 Although the record is not completely clear, this order appears to have been the product of a pretrial conference held by the court on April 8, 1983. At this conference, the parties submitted a pretrial stipulation. This stipulation did nothing, however, to narrow the issues for trial. For example, in T.D.S.' statement of its case, it stated that it was seeking punitive damages because Shelby had committed the independent torts of "fraud, trespass on the case, breach of fiduciary relationship, libel and slander, violation of the legislative mandate regarding unfair insurance practices and reckless misconduct." Shelby did not present a statement of its case at this time, because T.D.S.' allegations were so vague and conclusory that it could not respond to them. It advised the court of this problem and that the problem had been raised in several pending motions which remained unresolved. At the same time, Shelby informed the court, in its portion of the pretrial stipulation, of the defenses and counterclaim it intended to present once T.D.S. filed a complaint setting forth its claims in conformance with the rules, see Fed.R.Civ.P. 8(a) and 10(b). Given the absolute disarray in which the pleadings then stood, the court directed the parties to replead
 
 
 [13]
 By directing Shelby to answer whatever amended complaint T.D.S. filed, the court made it clear to Shelby that it would not consider a new round of motions to dismiss for failure to state a claim or to conform to the rules which require a pleader to set forth his claims in a coherent, organized way so that his opponent can frame a responsive pleading. See, e.g., Fed.R.Civ.P. 8(a) and 10(b). See infra note 14. Accordingly, Shelby addressed no further motions to T.D.S.' claims until trial, when it moved for directed verdicts at the end of the plaintiff's case and at the close of all the evidence
 
 
 [14]
 Fed.R.Civ.P. 8(a)(2) requires a pleader, in setting forth a claim for relief, to present "a short and plain statement of the claim showing that the pleader is entitled to relief."
 Fed.R.Civ.P. 10(b) provides that
 All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.
 The purpose of these rules is self-evident, to require the pleader to present his claims discretely and succinctly, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not. "Shotgun" pleadings, calculated to confuse the "enemy," and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by the letter, if not the spirit, of these rules. Attorney Berry's third amended complaint, see Appendix, Exhibit B, was a paradigmatic shotgun pleading, containing a variety of contract and tort claims interwoven in a haphazard fashion. Moreover, it included personal claims of the Starrs which the court had previously rejected, see supra text accompanying note 11, and precluded Berry from repleading. The district court should have rejected the third amended complaint out of hand and sanctioned Berry for filing it. See, e.g., Fed.R.Civ.P. 11 (providing for sanctions, which "may include an order to pay to the other party ... the amount of the reasonable expenses incurred because of the filing of the pleading ... including a reasonable attorney's fee." Although these Rule 11 sanctions were not provided for until August 1, 1983, a short time after Berry filed his pleading, the court could have imposed sanctions under its inherent power to control the conduct of litigation pending before it.)
 
 
 [15]
 The record makes it clear that Berry knew, when he filed his third amended complaint, that long-standing Florida precedent foreclosed his "fiduciary relationship" theory, the keystone of his tort action against Shelby. He had an ethical duty to concede this point to the district court, yet he refused to do so. The district court allowed Berry to capitalize on this invalid theory throughout the trial, until the parties rested and a charge conference convened. The court then realized that Berry's theory was erroneous and charged the jury that the insurance contract had not created a fiduciary relationship between T.D.S. and Shelby but, rather, a creditor-debtor relationship. See Appendix, Exhibit C, paragraph 29. By then, the prejudice Berry had sought by his allegation had been obtained
 
 
 [16]
 The district court did not convene a pretrial conference after T.D.S. filed its third amended complaint and Shelby responded; nor did it take any action sua sponte to define the issues for trial
 
 
 [17]
 Shelby objected to this time constraint and, in its motion for new trial, alleged that the trial judge's mechanical adherence to it, with constant reminders that the "meter was running" and about the number of minutes a lawyer had left, had materially prejudiced the presentation of its defense. In this appeal, Shelby does not assign the trial judge's action as reversible error, and I therefore do not consider it as such. I mention the time constraint because it describes the highly pressurized atmosphere in which the judge made her critical rulings and, in particular, fashioned the jury charge that I find irreconcilable
 
 
 [18]
 As I point out in Part II.A., infra, however, the court also instructed the jury on T.D.S.' bad faith claim. See supra note 8
 
 
 [19]
 Moreover, T.D.S. makes no claim to this court, by way of cross appeal, that the district court erred in taking the other "independent" tort claims, such as libel and slander, from the jury
 
 
 [20]
 See Appendix, Exhibit C, paragraphs 25-27 and 30. The majority ignores the court's count two bad faith instruction, which it says would have been precluded by Florida law, ante p. 1527, insisting that the district court only instructed the jury on the "independent tort of fraud." Ante p. 1529. A sequential reading of the court's charge makes it plain, I submit, that the court submitted two tort claims to the jury: one based on bad faith, the other on fraud and deceit. As Exhibit C of the Appendix discloses, the court's instructions on T.D.S.' bad faith claim begin with paragraph 25 of the court's charge and, including Shelby's defenses thereto, end with paragraph 35
 Paragraphs 25-27 and 30, with the exception of the gloss I describe infra in the text following note 21, present a bad faith claim about as straightforwardly as one can be stated: the plaintiff claims that the defendant breached the policy of insurance by not paying the plaintiff's claim thereunder, and that the defendant's conduct amounted to deliberate, overt and dishonest dealings entitling the plaintiff to punitive damages." "[T]he insurer must not only have refused to pay the insured's claim, [but] the insurance company must also be guilty of deliberate, overt and dishonest dealings with respect to such claim." (Emphasis added). Shelby's allegedly tortious conduct, its dishonest dealings, was not paying the claim. Nowhere in its charge to the jury did the court define "dishonest dealings"; perforce, dishonest dealings had to mean the failure to pay as required by the policy. The court instructed the jury that Shelby could not be guilty of such failure to pay and dishonest dealings if it proved that T.D.S. committed arson or deliberately concealed material facts from Shelby. See Appendix, Exhibit C, paragraphs 34 and 35. And that could not be ascertained until the jury returned its verdict on the count one policy claim. This, in my view is classic bad faith analysis, with the exception of the gloss I have mentioned.
 The court's instructions on T.D.S.' fraud claim begin with paragraph 43, following several instructions on the damages the jury should consider if it found for T.D.S. on its count one claim under the insurance contract, and end with paragraph 57. The instructions are entirely separate from those dealing with T.D.S.' count two bad faith claim and do not explicitly relate to it. They stated only that "[I]n this case plaintiff's claim against the defendant is based on certain allegedly false and fraudulent misrepresentations made by the defendant to the plaintiff." (Emphasis added). Which "plaintiff's claim" the court was referring to is not stated anywhere in the instructions. For all we know, the jury treated it as a third claim, unrelated to counts one and two.
 
 
 [21]
 The court's instructions on this point were somewhat confusing and, I believe, irreconcilable: Did T.D.S. have to prove, as part of its bad faith claim, that Shelby should have paid T.D.S.' personal property loss because it had no basis for denying liability on the ground of arson or deliberate concealment of material fact; or was it Shelby's burden to establish such basis for denying liability? One could argue that T.D.S. had the burden because, as the court instructed in paragraphs 26 and 27 of its charge, see Appendix, Exhibit C, it had to establish by a preponderance of the evidence that Shelby "breached the insurance policy ... by not paying [T.D.S.] the amount owed ... under the policy," meaning that T.D.S. had not set the fire or deliberately concealed material facts from Shelby. On the other hand, one could argue that Shelby had the burden of proving arson and deliberate concealment because the court instructed the jury, in paragraph 34, that they constituted affirmative defenses Shelby had to establish
 
 
 [22]
 Had the district court defined the plaintiff's claims for trial, by requiring T.D.S. to replead its complaint or conducting a pretrial conference, the trial would have been limited to T.D.S.' fire insurance claim. As I point out in Part III. infra, consequential or special contract damages would not have been involved, and, as shown in Part II., T.D.S. had no cognizable tort claims
 
 
 [23]
 The majority's statements about Florida's preclusion of first party bad faith claims notwithstanding, I read the majority's affirmance of the punitive damages award made pursuant to the bad faith instructions the court delivered in this case, see supra note 20, as an approval of those instructions. The majority has unambiguously placed insurance companies in this state on notice that, as far as the federal courts are concerned, Florida law allows an insured to collect punitive damages from his fire insurance company even though a jury question exists as to whether the insured deliberately created his fire loss. Ante p. 1529 ("the fact that a jury question existed on the arson defense did not preclude submission of the punitive damages claim to the jury.")
 
 
 [24]
 The district court described T.D.S.' claim of fraud and deceit to the jury in this manner. See Appendix, Exhibit C, paragraphs 45 through 49
 
 
 [25]
 It is debatable whether statements (2) and (4) were statements of fact as to Shelby's then state of mind or mere promises which are not actionable under the law of fraud and deceit when the promisor fails to carry them out. See, e.g., Alexander/Davis Properties, Inc. v. Graham, 397 So.2d 699, 706 (Fla.Dist.Ct.App.1981)
 
 
 [26]
 I agree with the result the majority reaches regarding T.D.S.' claims for lost profits, the loss of the Starrs' option to purchase Cohenour's building, and injury to T.D.S.' credit reputation. Those claims had no more validity than T.D.S.' claim for the value of its restaurant and lounge
 
 
 [27]
 Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854). The majority states that the district court instructed the jury that it could award T.D.S. consequential or special damages as a part of T.D.S.' insurance contract claim (count one) or its tort claim (count two). Ante pp. 1532 - 1533. I disagree. The district court informed the jury that it could award T.D.S. such damages "[in] connection with its first claim," count one, for Shelby's "failure ... to pay any amounts due under the insurance policy." See Appendix, Exhibit C, paragraphs 40-42. It is true that in paragraphs 58 and 59 of its charge, following its instructions on fraud and deceit, the court referred again to special damages; however, the court did not explicitly tie that reference to T.D.S.'s fraud and deceit claim. Accordingly, I conclude that this additional reference merely augmented the court's earlier instructions on T.D.S.' count one insurance contract claim
 
 
 [28]
 T.D.S. purchased the following coverages: comprehensive general liability insurance, employer's nonownership automobile liability insurance, completed operations and products liability insurance, mercantile robbery and safe burglary insurance, and the fire insurance involved in this suit
 
 
 [29]
 At the time T.D.S. purchased its multi-peril policy from Shelby, it did not acquire "business interruption" insurance